## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| **v.** | *. | **CRIM. NO. JKB-25-00176** |
| **JACK LASOTA,** | * | |
| **Defendant.** | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

### MEMORANDUM

Pending before the Court is Defendant Jack LaSota's[1] Motion to Dismiss Count One of the Indictment (ECF No. 29). The Court has reviewed the parties' briefing and has determined that no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2025). For the reasons that follow, the Motion will be denied.

### I. BACKGROUND

According to the Indictment, LaSota was a fugitive from justice, and while knowing that she was a fugitive from justice, she possessed multiple firearms as well as ammunition. (ECF No. 1 at 1.) Specifically, she is alleged to have possessed a scoped .50 caliber rifle, a 9x19mm handgun, approximately 420 rounds of .50 caliber ammunition, and approximately 54 rounds of 9x19mm ammunition. (*Id.* at 1–2.)

In their briefing, the parties provide several additional background facts. They explain that LaSota was previously charged in state criminal proceedings in California and Pennsylvania. (ECF No. 34 at 1–2.) In these cases, LaSota was charged with one felony and multiple

---

[1] The Indictment names Defendant as "Jack LaSota" and the Government uses male pronouns to refer to LaSota in its briefing. However, LaSota states that her name is "Ziz LaSota" and that she is a transgender woman who uses female pronouns. The Court refers to Defendant as "Jack LaSota" here to match the Indictment but will use female pronouns to refer to her, in accordance with her preference.

misdemeanors. (ECF Nos. 34-1 at 1; 29 at 4). LaSota claims that all of the alleged criminal conduct was nonviolent. (ECF No. 29 at 4.) The Government explains that LaSota missed court hearings in both cases, so in both of them, bench warrants were issued for her arrest. (ECF No. 34 at 2–3.) Then, in February 2025, LaSota was found with the above-described firearms and ammunition, and she was arrested by Maryland local police. (*Id.* at 3.) A federal grand jury then charged LaSota with being a fugitive from justice in possession of firearms and ammunition, in violation of 18 U.S.C. § 922(g)(2). LaSota's Motion to Dismiss argues that § 922(g)(2) is unconstitutional under the Second Amendment, both on its face and as applied to her case.[2]

## II. LEGAL STANDARDS

### A. Standard of Review

A court must dismiss an indictment if, upon a proper motion by the defendant, the court finds that the indictment fails to state an offense. Fed. R. Crim. P. 12(b)(3)(B)(v). If a count of the indictment charges a violation of a statute that is unconstitutional, then that count fails to state an offense. *United States v. Crawford*, No. CR MJG-15-0322, 2016 WL 4662334, at *1 (D. Md. Sept. 7, 2016). "A district court is limited to considering the factual allegations in the indictment and must accept them as true in ruling on a motion to dismiss." *United States v. Brewbaker*, 87 F.4th 563, 579 (4th Cir. 2023).

### B. Statutory Framework

Under 18 U.S.C. § 922(g)(2), it "shall be unlawful for any person who is a fugitive from justice to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." A "fugitive from justice" is defined as "any person

---

[2] As far as the Court is aware, the constitutionality of § 922(g)(2) is a question of first impression in any federal court.

2

who has fled from any State to avoid prosecution for a crime or to avoid giving testimony in any criminal proceeding." *Id.* § 921(a)(15).

## C. Facial and As-Applied Challenges

To prevail on a facial challenge to the constitutionality of a statute, a litigant must "establish that no set of circumstances exists under which the [statute] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). A litigant cannot prevail if the statute "is constitutional in some of its applications." *United States v. Gould*, 163 F.4th 795, 798 (4th Cir. 2026) (quoting *United States v. Rahimi*, 602 U.S. 680, 693 (2024)). A facial challenge is "the most difficult challenge to mount successfully." *Id.* (quoting *Salerno*, 481 U.S. at 745). An as-applied challenge poses a lesser burden. This type of challenge "test[s] the constitutionality of a statute applied to the [Defendant] based on the record." *Cap. Associated Indus., Inc. v. Stein*, 922 F.3d 198, 204 (4th Cir. 2019).

## D. Second Amendment

In *District of Columbia v. Heller*, 554 U.S. 570, 581 (2008), the Supreme Court explained that the Second Amendment confers an individual right to keep and bear arms for self-defense. Fourteen years later, in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), the Court held that lower courts should conduct a two-step analysis to determine the constitutionality of a statute under the Second Amendment. *United States v. Price*, 111 F.4th 392, 398 (4th Cir. 2024) (en banc) (citing *Bruen*, 597 U.S. at 24), *cert. denied*, 145 S. Ct. 1891 (2025). At step one, the Court "must ask whether the Second Amendment's plain text covers the conduct at issue." *Id.* If not, then the Second Amendment does not apply. *Id.* But if the plain text does cover the conduct, then the Court must proceed to step two. *Id.* At step two, the Court asks "whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602

3

U.S. at 692.

## III. DISCUSSION

With these standards in mind, the Court now wades into the *Bruen* thicket. *See id.* at 742 (Jackson, J., concurring). The Court will first address the facial challenge and then will evaluate the as-applied challenge.

### A. Facial Challenge

#### 1. *Bruen* Step One

To determine if the Second Amendment's text covers the relevant conduct, the Court asks three questions:

> (1) whether the petitioner[] [was] "part of the people whom the Second Amendment protects"; (2) whether the weapons regulated by the challenged regulation were "in common use" for a lawful purpose, [i.e.,] in [*Bruen*], [for] "self-defense"; and (3) whether the Second Amendment protected the petitioner['s] "proposed course of conduct."

*Price*, 111 F.4th at 400 (quoting *Bruen*, 597 U.S. at 31–32). LaSota must meet all three requirements to satisfy step one.

The parties primarily debate whether fugitives are among "the people" protected by the Second Amendment. As the Government notes, the Fourth Circuit has held that felons are not among "the people" because they are not "law-abiding." *United States v. Hunt*, 123 F.4th 697, 705 (4th Cir. 2024), *cert. denied*, 145 S. Ct. 2756 (2025) (quoting *Heller*, 554 U.S. at 592). But in several recent cases, the Fourth Circuit has declined to address whether certain other categories of people—felony indictees and domestic violence misdemeanants—are included in "the people." *United States v. Jackson*, 152 F.4th 564, 567 n.3 (4th Cir. 2025); *United States v. Nutter*, 137 F.4th 224, 230 (4th Cir. 2025), *cert. denied*, 146 S. Ct. 270 (2025). The Court is attracted to the Government's argument that fugitives are most akin to felons and are thus not included among

4

"the people" because neither group is "law-abiding." But given the disagreements on how to define "the people" both at the Fourth Circuit and between the Circuits,[3] and considering that resolution of this specific question is not strictly necessary in order for the Court to rule on the instant Motion, the Court declines to rule on this issue today. Instead, the Court will decide the facial challenge at *Bruen* step two because it certainly fails at that step.

### 2. *Bruen* Step Two

To determine whether § 922(g)(2) "is consistent with the principles that underpin our regulatory tradition," the Court must "ascertain whether [§ 922(g)(2)] is 'relevantly similar' to laws that our tradition is understood to permit." *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 29). "Why and how the regulation burdens the right are central to this inquiry." *Id.* When conducting this analysis, the Court must keep in mind that our law is not "trapped in amber," *id.* at 691, and that only a "historical analogue" is required, not a "historical twin," *id.* at 701.

### a. § 922(g)(2)'s "How" and "Why"

The Fourth Circuit's recent decision in *United States v. Jackson*, 152 F.4th 564 (4th Cir. 2025) sets out the proper "how" and "why" analysis. That is because *Jackson* assessed the constitutionality of 18 U.S.C. § 922(n), which prohibits felony indictees from transporting firearms. *Id.* at 567. And the history and purposes of that statute essentially mirror those of § 922(g)(2).

As the *Jackson* court explained, § 922(n)'s "'how' is straightforward: temporary disarmament, on pain of criminal sanction." *Id.* at 569. So too for § 922(g)(2).

As for the "why," *Jackson* surveyed § 922(n)'s legislative history and concluded that the statute's "why" is to balance public safety with the rights of law-abiding citizens. *Id.* at 570. The

---

[3] *Compare Range v. Att'y Gen. United States*, 124 F.4th 218, 228 (3d Cir. 2024) (en banc) (holding that felons are among "the people"), *with Hunt*, 123 F.4th at 705 (holding that felons are not among "the people").

5

same is true for § 922(g)(2) because the provisions largely share the same legislative history. They both originate in the Federal Firearms Act of 1938. Ch. 850, 52 Stat. 1250, 1251 (1938). The goal of that statute "was to 'eliminate the gun from the crooks' hands, while interfering as little as possible with law-abiding citizens.'" *Id.* (quoting S. Rep. No. 75-82, at 2 (1937)) (citation modified). At the time, the statute only applied to those indicted for, or fugitives from prosecutions for, crimes of violence. Ch. 850, 52 Stat. at 1250–51. In 1961, Congress amended the two provisions to make them applicable to all felonies, not just crimes of violence. Act of Oct. 3, 1961, Pub. L. No. 87-342, §§ 1–2, 75 Stat. 757, 757. Congress then recodified these two provisions in the Gun Control Act of 1968. Pub. L. No. 90-618, 82 Stat. 1213. Notably, while the Gun Control Act's restrictions continued to apply to those under indictment only for felonies, it altered the definition of "fugitive from justice" to include those fleeing prosecution for any crime, not just felonies. Gun Control Act § 102, 82 Stat. at 1216. Like the Federal Firearms Act, the purpose of the Gun Control Act was to "support . . . law enforcement officials in their fight against crime and violence." Gun Control Act § 101, 82 Stat. at 1213. It was not "to place undue or unnecessary . . . . burdens on law-abiding citizens." *Id.* The fugitive provision has remained the same since 1968 while the indictee provision was amended once more in 1986. *Jackson*, 152 F.4th at 570. Overall, then, the indictee and fugitive statutes share nearly identical legislative histories. Thus, as the *Jackson* court concluded for § 922(n), this Court concludes that the "why" for § 922(g)(2) is to strike a balance between the public's interest "in keeping arms away from those who might misuse them and the rights of individuals to be free from government intrusion." *Id.*

### b. Historical Analogues

Next, the Court puts on its "historian cap[]," *Gould*, 163 F.4th at 800, to determine if the "how" and "why" of § 922(g)(2) match up with those of any historical regulations. Here, the

Government analogizes to Founding-era laws that disarmed "dangerous persons." (ECF No. 34 at 12–13.) The Court agrees that this historical analogue is sufficient to reject LaSota's facial challenge.

The Fourth Circuit has held multiple times "that our historical tradition of gun regulation allows 'status-based restrictions to disqualify categories of persons from possessing firearms.'" *Jackson*, 152 F.4th at 577 (quoting *Hunt*, 123 F.4th at 705). That is because early state legislatures "could prohibit gun ownership by groups of persons that the legislature deemed 'potentially violent or dangerous.'" *Id.* (quoting *Hunt*, 123 F.4th at 707). Thus, Congress can now "legislate using proxies for dangerousness." *Id.* For instance, in *Hunt*, the Fourth Circuit upheld Congress' ability to impose a lifetime ban on felons possessing firearms. 123 F.4th at 707–08. And in *Jackson*, the Fourth Circuit concluded that "although 'felony indictment' is a less effective proxy for dangerousness than 'felony conviction,' § 922(n)'s temporary and partial disarmament burdens Second Amendment rights far less severely than does § 922(g)(1)'s lifetime ban." 152 F.4th at 577. Again, *Jackson*'s rationale applies to § 922(g)(2). Fugitives are more dangerous than felony indictees because they have ordinarily been charged with a crime *and* fled from prosecution. But like felony indictees, they are only temporarily disarmed. Thus, fugitive status is a valid proxy for dangerousness (the "why") and § 922(g)(2) permissibly requires temporary disarmament (the "how"). Accordingly, LaSota's facial challenge fails on this basis as well.[4]

## B. As-Applied Challenge

The Court now turns to the as-applied challenge. LaSota argues that she only fled from

---

[4] Even if the Court were to find that early states' "dangerous persons" laws were not proper historical analogues, it would still reject LaSota's facial challenge because § 922(g)(2) is "sufficiently analogous" to Founding-era surety laws. *See Jackson*, 152 F.4th at 575. *Jackson* examined four factors—conduct, process, time-boundedness, and severity—and found that § 922(n) was "relevantly similar" to surety laws in all four respects. *Id.* at 575–77. These four factors apply nearly identically to § 922(g)(2) as they do to § 922(n). Thus, this constitutes an additional independent basis to reject LaSota's facial challenge.

7

prosecutions for "non-violent offenses, comprised largely of misdemeanors." (ECF No. 29 at 4.) Thus, in her view, § 922(g)(2) is unconstitutional as applied to her because she is not a fugitive from prosecution for "serious crimes." (ECF No. 40 at 7.) But that is ultimately irrelevant because, as the Fourth Circuit held for § 922(g)(1) (which prohibits felons from possessing firearms), *Hunt*, 123 F.4th at 705, this Court holds that as-applied challenges to § 922(g)(2) are categorically barred.[5]

First, as with the facial challenge, the Court need not decide if LaSota's challenge fails at *Bruen* step one because "regardless of how the first step analysis would be resolved here, the statute survives" at *Bruen* step two. *Nutter*, 137 F.4th at 230.

At step two, the Court again analogizes to Founding-era "dangerous persons" laws. In *Hunt*, the Fourth Circuit explained that these "dangerous persons" laws did not merely prohibit specific individuals, who had been previously adjudicated to be dangerous, from possessing guns. *See Hunt*, 123 F.4th at 707. Rather, these laws "prohibited possession by categories of persons based on a conclusion that the *category as a whole* presented an unacceptable risk of danger if armed." *Hunt*, 123 F.4th at 707 (emphasis added) (quoting *United States v. Jackson*, 110 F.4th 1120, 1128 (8th Cir. 2024)). The Fourth Circuit further explained:

> A determination of dangerousness was sometimes made by status, like "[r]eligious minorities, such as Catholics," or "Native Americans," and sometimes by conduct, like non-oath-takers. [*Jackson*, 110 F.4th] at 1126. Those historical restrictions swept broadly, disarming all people belonging to groups that were, in the judgment of those early legislatures, potentially violent or dangerous. Even though "not all Protestants or Catholics in England, not all Native Americans, not all Catholics in Maryland,

---

[5] The Court notes that the Indictment merely states that LaSota was a fugitive from justice, that she knew she was a fugitive, and that she possessed the firearms and ammunition at issue. (ECF No. 1 at 1–2.) There are no factual allegations in the Indictment detailing which underlying criminal prosecutions LaSota was allegedly fleeing from. Although the Court "is limited to considering the factual allegations in the indictment," *Brewbaker*, 87 F.4th at 579, it may still rule on the as-applied challenge at this stage because it is irrelevant what the underlying prosecutions were for. As the Court explains, fugitives from justice are categorically barred from bringing as-applied challenges, no matter the nature of the underlying prosecution from which they have fled.

> not all early Americans who declined to swear an oath of loyalty . . . were violent or dangerous persons," all could be disarmed. *Id.* at 1128. "This history demonstrates that there is no requirement for an individualized determination of dangerousness as to each person in a class of prohibited persons."

*Hunt*, 123 F.4th at 707. The *Hunt* court concluded that "past conduct (like committing a felony) can warrant keeping firearms away from persons who might be expected to misuse them." *Id.* (internal quotation marks omitted).

So too with § 922(g)(2). When Congress passed the Gun Control Act in 1968, it made a categorical judgment that all "fugitives from justice" were dangerous enough to be disarmed. And critically, that included fugitives from prosecutions for misdemeanors and nonviolent crimes. The statutory history of § 922(g)(2) could not make this any clearer. When Congress was drafting the Gun Control Act, the Senate and the House initially disagreed as to the scope of § 922(g)(2). H.R. Rep. No. 90-1956, at 30 (1968) (Conf. Rep.). The House bill covered fugitives from prosecution for all crimes, but the Senate version stated that only fugitives from prosecutions for felonies would fall under § 922(g)(2)'s proscription. *Id.* Ultimately, Congress "adopt[ed] the broader restrictions provided in the House bill." *Id.* Thus, here, it is irrelevant which underlying crimes LaSota was fleeing prosecution for. Just as legislatures 250 years ago determined, for instance, that all non-oath-takers were too dangerous to possess firearms, Congress has now determined that all fugitives from justice—whether they are fleeing felonies, misdemeanors, violent crimes, or nonviolent crimes—are too dangerous to possess firearms.

To be sure, LaSota rejects the notion that someone fleeing prosecution for misdemeanors and nonviolent crimes could be dangerous. (ECF No. 29 at 4.) But the power to make that determination is entrusted to Congress, not to LaSota and not to this Court. As the *Hunt* court explained, "the power to determine the content of the criminal law is serious business. But

9

legislatures have always had that power, and it is subject to few constitutional restraints." *Hunt*, 123 F.4th at 707. Here, Congress exercised that power to classify all fugitives from justice as dangerous enough to be disarmed. That statute is "relevantly similar" to the numerous Founding-era laws that categorically disarmed "dangerous persons." *See Rahimi*, 602 U.S. at 692. And that is precisely the "historical analogue" that *Bruen* and *Rahimi* require for a statute to withstand scrutiny under the Second Amendment. Therefore, the Court concludes that "there is no requirement for an individualized determination of dangerousness as to each person" accused of being a fugitive from justice in possession of a firearm under § 922(g)(2). *See Hunt*, 123 F.4th at 707 (internal quotation marks omitted). Accordingly, LaSota's as-applied challenge will be denied.

## IV. CONCLUSION

For the foregoing reasons, LaSota's Motion to Dismiss Count One of the Indictment (ECF No. 29) will be denied. A separate Order follows.

DATED this 4 day of March, 2026.

BY THE COURT:

James K. Bredar
United States District Judge

10