Elua (“Daniel Blank”); [redacted], [redacted], [redacted] ; [redacted];

the-real-elua@proton.me

October 27, 2026

Clerk of Court United States District Court for the District of Maryland, Baltimore Division: 101 W. Lombard Street, Baltimore, MD 21201

**Re: USA v. LaSota - Ziz, Case No. 1:25-cr-00176-JKB — Transmittal of Defendant's letter to the court at her written request, for filing on the docket**

To the Clerk of Court:

I am writing to transmit a letter to the court from Ziz (falsely held under the name “Jack LaSota”), the defendant in the above case. Her BOP register number is 25243-512, and she is currently imprisoned at FDC Philadelphia. She sent the letter in a series of emails via the BOP’s email system, Corrlinks. This is because, as she describes, she has been deprived of access to counsel, writing materials (including mail supplies), and her own legal papers, including when she was recently moved to the <Special Housing Unit> of FDC Philadelphia for almost a month, where she didn’t have access to the legal library or, by my understanding, legal calls.

Her request to me, quoted verbatim from an email that Corrlinks marks as sent on 10/22/2026 1:49:49 PM:

> <I guess I am going to, as a last-ditch effort, all lawyer meetings having been cut short, (the one lawyer phone call they let me receive here at about 30 minutes, by staff tripping on the phone cord and not plugging it back in and restarting the call) hereby ask that Elua, whom I am sending this series of post-SHU updates emails to, put them into a letter, to the Baltimore court, apply whatever formatting and references to case number or whatever is required for this email series to be entered verbatim in the docket and for the motions I mention herein to be noted as best-effort issued before the deadline a journalist (not my lawyer) just told me looms over me for filing *all motions(?!)*, although I would like to have a lawyer that had the stamina and time to deal with this, or to have the necessary time and circumstances to complete them, my continued silence or hope in the system, or saying this through the normal channels, would be against all reason and experience.

> Elua, please put this in an envelope and write my name on it (you can write yours too), you can put your address as the return address, I authorize you to receive mail on my behalf to the extent that would result from such use of return address, put full printouts of each of these emails, and include a note saying that facilitation of my letter via email to the court was through your assistance.>

Based on that request, I am here sending the letter, consisting of complete, unaltered printouts of 7 emails from Ziz, listed below. Ziz asks that these be entered on the docket verbatim; that the motions she files in them be noted as best-effort issued before any pending motions deadline; and that James K. Bredar, who is set to try the case, be given notice of them. Ziz also requested that I supply some other information in attachments; these are also listed below, after the 7 emails comprising the letter. All timestamps used throughout are those shown by the Corrlinks website as when an email was sent.

Enclosures :

1. Exhibit 1 — Email of 10/22/2026 10:06:11 AM, subject line <Updates post-SHU part 1> (3 pages)
2. Exhibit 2 — Email of 10/22/2026 1:49:49 PM, subject line <Updates post-SHU part 2> (3 pages)
3. Exhibit 3 — Email of 10/22/2026 3:20:36 PM, subject line <Updates Post-SHU Part 3> (4 pages)
4. Exhibit 4 — Email of 10/22/2026 8:06:14 PM, subject line <Updates Post-SHU part 4> (4 pages)
5. Exhibit 5 — Email of 10/22/2026 9:49:29 PM, subject line <Updates Post-SHU part 5> (3 pages)
6. Exhibit 6 — Email of 10/23/2026 2:06:21 PM, subject line <Updates Post-SHU Part 6> (4 pages)
7. Exhibit 7 — Email of 10/23/2026 3:49:55 PM, subject line <Updates Post-SHU Part 7> (2 pages)
8. Attachment 1 — Email exchange with Ziz concerning errors to be corrected in the preceding emails. Timestamps and senders marked for each email. (3 pages)
9. Attachment 2 — Emails from Ziz regarding her situation at FDC Philadelphia, before she was sent to the SHU. Timestamps marked for each email. (22 pages)
10. Attachment 3 — Email exchange with Ziz concerning my notes from calls with her before she was sent to the SHU, including those notes themselves. Timestamps and senders marked for each email. (2 pages)

11. Attachment 4 — A motion by Truth, in a state case in Allegany County, Maryland, that Ziz cites and asks to be attached. (20 pages)

The pages marked as a note of facilitation in the upper right corner are the note of facilitation Ziz requested: facilitation of her letter via email to the court was through my assistance.

The pages immediately following this note are an index to the enclosures, listing where Ziz makes motions, requests, and other notable statements.

I am simultaneously sending copies of this note and of Ziz's letter to her lawyer, Teresa Whalen, and to the United States Attorney's Office for the District of Maryland.

Elua

**Declaration:** I declare under penalty of perjury that Exhibits 1-7 and Attachments 1-3 consist of true reproductions of emails sent from or to Ziz through the CorrLinks system on the dates and times shown on their faces, and that the quotation above is reproduced verbatim from her email to me. Executed on October 27, 2026.

Elua

cc: Teresa Whalen: 801 Wayne Ave., Ste. 400, Silver Spring, MD 20910 ; U.S. Attorney's Office, District of Maryland, 36 S Charles St Fourth Fl, Baltimore, MD 21201

**Part 1: Index of Motions, Assertions, and Requests**

Each entry quotes Ziz's own words verbatim and identifies the enclosed email in which they appear.

A. Self-representation and presence

1. <I said I wanted to self-represent back in March.> — Email of 10/22/2026, 10:06 AM [Ex. 1, p. 1]

2. <Apparently did not inform the court of my intention to self-represent.> — Email of 10/22/2026, 10:06 AM [Ex. 1, p. 1], referring to Whalen.

3. <I believe I need to represent myself because it seems like that is the only way I am going to get to see any discovery.> — Email of 10/23/2026, 3:49 PM [Ex. 7, p. 1]

4. <...my repeated pleading over the months to Whalen to bring me into court, and saying that I assert my right to be present, and my right to a speedy trial.> — Email of 10/22/2026, 10:06 AM [Ex. 1, p. 2]

B. Speedy trial / due process

5. <I have not waived my speedy trial rights...> — Email of 10/23/2026 2:06 PM [Ex. 6, p. 3]

6. <Having this entire time been faced with the setbacks, interference, and prevention from doing work... delays of speedy trial considerations... were NOT in the interest of justice. Therefore, my speedy trial rights were violated.> — Email of 10/23/2026, 2:06 PM [Ex. 6, p. 2]

7. <And Whalen acted against my explicit instructions, without any communication to me, I'm told, in agreeing with interests of justice time exclusions. I contest that agreement on grounds of ineffective/countereffective counsel.> — Email of 10/23/2026, 2:06 PM [Ex. 6 p. 3]

8. <Also, this is an argument there are constitutionally-recognized due process rights which provide an independent from the "speedy trial act" vehicle for a dismissal argument. ...> — Email of 10/23/2026, 2:06 PM [Ex. 6, p. 2]

C. Motions stated in the enclosures

10. <I move to compel discovery.> — Email of 10/22/2026, 1:49 PM [Ex. 2, p. 2]

11. <I hereby move for a subpoena for video and audio footage of all my time in the SHU, and for any footage that might be relevant to any of the abuses that I have suffered here to be preserved.> — Email of 10/22/2026, 9:49 PM [Ex. 5, p. 1]

12. <I feel it is necessary to import the parts of that motion in the state case to this one that can be applied, as well as the motions to dismiss based on the denial of due process, based on ACDC's, especially Lt. Gilpin's, continual interference in attorney-client communications, search and

siezure of clearly labeled legal notes (some are in the discoverey). I so move.> — Email of 10/23/2026, 2:06 PM [Ex. 6, p. 1]

13. <I move to have our own experts able to independently forensically examine all digital devices to make copies, because I know that they took more than the data that has been reported. I move for the court to provide for this because, all of my possessions having been copped, (the literal meaning of course being "grabbed"), I have no money or income to do so.> — Email of 10/23/2026, 3:49 PM [Ex. 7, p. 1]

14. <I move to see all discovery, not just that which was exempt from protective orders because it was already disclosed in the state case.> — Email of 10/23/2026, 3:49 PM [Ex. 7, p. 1]

15. <I move as I have moved in the state case, and I note that I should have had counsel by now go through those records to collect those arguments and present them to the federal court, in order that the FBI may be federally subpoena'd for that information. I move to so subpoena the FBI. I move to include in the federal case a repeat of my joiner of Truth's motion in the state case... > — Email of 10/23/2026, 3:49 PM [Ex. 7, p. 1]

D. Requests addressed to the Court

16. <Because my appointed counsel has failed to advise me on what the court may be able to offer as far as investigating, through methods including subpoenas of the FBI, this witness tampering and intimidation, upon a witness for the defense, or how I might compose motions to represent my case to the court that such action is necessary, I find it necessary that I abandon hoping in having such discussion within attorney-client privilege, and seek the court's advice on what to do about witness tampering and intimidation by the prosecution and allies. What should I do?>

17. < In strict truth, the FBI has acted to develop a conflict of interest between anyone who works in or in transitive cooperation with the United States government, and it is reasonable to expect any judge who is part of the federal government to subject to this conflict of interest. I find it necessary to ask the court's advice, since counsel in my experience has had nothing more to offer than helplessness, regarding what remedy I should pursue in light of this, and how I should do so.> — Email of 10/23/2026, 3:49 PM [Ex. 7, p. 2]

18. <I challenge the court to answer whether a Jew, charged by Nazi Germany under Nazis' pretenses, fleeing not the case, but the Holocaust itself, would be considered, if tried according to what the United States holds to be law, a fugitive from justice. Because if you think that that, if taken as an analogy, would be an overstatement, you need to understand more of the history of the campaign of injustice that has been waged against me because I defied powerful child molesters with connections that reach at least as high as Epstein and Elon Musk, at most one ear away from the president, whose encouragement to perpetrate something as Holocaust-like as could be gotten away with has gotten my friends shot and killed. If the interests of justice have any say here, the court must provide a way that the answer to that question is "no". What ought I to do? Appeal to international law? Again I find it necessary to ask the court's advice.> — Email of 10/23/2026, 3:49 PM [Ex. 7, p. 2]

17. <I guess I am going to, as a last-ditch effort, all lawyer meetings having been cut short, (the one lawyer phone call they let me receive here at about 30 minutes, by staff tripping on the phone cord and not plugging it back in and restarting the call) hereby ask that Elua, whom I am sending this series of post-SHU updates emails to, put them into a letter, to the Baltimore court, apply whatever formatting and references to case number or whatever is required for this email series to be entered verbatim in the docket and for the motions I mention herein to be noted as best-effort issued before the deadline a journalist (not my lawyer) just told me looms over me for filing *all motions(?!)*, although I would like to have a lawyer that had the stamina and time to deal with this, or to have the necessary time and circumstances to complete them, my continued silence or hope in the system, or saying this through the normal channels, would be against all reason and experience.> — Email of 10/22/2026, 1:49 PM [Ex. 2, p. 2]

**Part 2: Reference Appendix**

Prepared and attached by Elua at Ziz's request, stated in her letter, where I have highlighted references that she makes.

1. <And Whalen acted against my explicit instructions, without any communication to me, I'm told, in agreeing with interests of justice time exclusions. I contest that agreement on grounds of ineffective/countereffective counsel. There is precedent for this in I don't remember the case (Elua, I think you have it, what was it? You could add a note with the answer in the attachments maybe?): also I-don't-remember-the-case said that the defendant *cannot* just waive speedy trial, because interests of justice affect the public too. (Elua what was that? Also attach?)> — Email of 10/23/2026 2:06 PM [Ex. 6, p. 3]

The second case was *Zedner v. United States*. The first case she mentioned, I did not in fact have.

2. <Elua, I don't know if they will let you, but I would appreciate a paste here of the reports that I made in pre-SHU episodes of this chronicle, especially the ones about officer Akram trying to get me to fight other prisoners to take their food, and declaring it to be even funnier than me starving, was that the wording, that I was getting my commissary stolen?> — Email of 10/22/2026, 9:49 PM [Ex. 5, p. 1]

<Like McDonald was being sadistic, Akram too (see accounts I hope Elua attaches), and sadism is an inherently imperfect thing.> — Email of 10/23/2026 2:06 PM [Ex. 6, p. 3]

The accounts of Akram are in Attachment 2 (consisting of emails from Ziz sent before she was in the SHU, expecially pages 7-9.

3. <A lieutenant trying to have me locked up alone with a (very muscular) collection man for the protections racket that targeted me, betrayed the intentions to lock me in the SHU in accordance with previous threats to put me there if I continued to complain. (Elua, can you attach the reference please? Since I no longer have my records of that). This is why I was putting ~"for my own safety" in quotes. > — Email of 10/22/2026, 9:49 PM [Ex. 5, p. 1]

The account of the previous threat is in Attachment 2, on page 2. Ziz describes Burton saying <And if you have any more issues you're gonna go to the SHU.>.

4. <I have been told that me suffering impairment of memory while suffering malnutrition (I hope some documentation for this which I have previously emailed out so that it could not be destroyed, thank goodness, will be attached by Elua.) is considered "prejudice", in the form of "prejudicing the defendant".> — Email of 10/23/2026, 2:06 PM [Ex. 6, p. 1]

Ziz mentions memory impairment as a result of malnutrition in Attachment 2, on at least pages 8, 9, and 15, including during the conversation with Burton.

5. < Elua, please incude Truth's motion as an attachment.> — Email of 10/23/2026, 2:06 PM [Ex. 6, p. 1]

This motion is Attachment 4.

6. < Nobody should be examining a case against me downstream of John David Pressman's claims that I'm a cult leader, without understanding that was written in response to me protesting against a rape cult. Elua, can I have attached as evidence Gyges's expose on that?> — Email of 10/23/2026, 3:49 PM [Ex. 7, p. 1]

The expose, when saved as a PDF, is over 100 pages, so I am not including it here. It can be found online at https://www.verysane.ai/p/ai-safety-is-mostly-a-sex-cult-in-berkeley-california .

I've just been told by Heath I have less than a month to file motions, and I doubt they'll give me more time when I tell them that I need to self-represent. Whalen has been horrible. Has gaslit me in the phone call yesterday, and in the one meeting that occured in the time I've been at FDC Philly. And did not file the motions I said I wanted filed by well over a month ago or I needed to self-represent. And blew off basically everything that it had agreed to do. Apparently did not inform the court of my intention to self-represent. So again I'm in a situation of the clock is ticking by, my stuff has been taken again so I still can't send mail right now, it may be 2 weeks before I can order commissary even if it's not stolen again to try to get the ability to start a letter in the mail, and who knows then if it will even arrive before the November deadline. I don't have the ability to even object to what Whalen, whom I never wanted to be represented by, and never consented to be represented, by, has decided to ignore my explicit instructions and consent to. With whatever allowance the court has made for me to put together a defense being eaten up by Whalen blowing off basically every motion that's necessary to my defense, with me entirely unable to say anything about it. I said I wanted to self-represent back in March.

And after what Proctor did I was afraid to say that to an attorney instead of at the court directly. I had hoped I would be able to start self-representing at the competency hearing where I would be found competent, but because the proceeding was dropped between court dates, I never got to go to court. (Proctor responding to my statement that I intended to announce at court the next day my intention to self-represent at an attorney-client meeting by saying actually Proctor was going to start the competency proceedings that same day in order to preempt me and prevent the discharge of counsel. Even though Proctor acknowledged the conflict of interest, and that conflict of interest was to the effect of Proctor wanting me to not go free by any means, even by misrepresenting me at the motion for a competency evaluation, at the competency hearing, and potentially at a hearing to determine by "clear and convincing evidence". And Proctor both lied about me and violated attorney client privilege at the raising of the doubt of competence. Proctor engineered a situation where I couldn't fire it, and that colored how I was able to act under competency evaluation. If I had been incompetent, it would have been necessary for me to hide that fact, because Proctor looming with the intention to exploit the conflict of interest, would make it likely that instead of assistance in restoring my competence were it lacking, I would receive more abuse, and Proctor's favorite demands to abandon my beliefs or else, dressed up and validated in the form of a manipulated diagnosis that Proctor pushed for. Proctor told me to take a plea deal, and when I refused threatened to do this abuse of the competency process. And Proctor sending the psychologist misleading information about me (Proctor was aware of a doubt as to whether I was the author of certain material, and represented that material to the psychologist as my work and as samples of my supposed thought to determine my competence), and Proctor knowingly called down a system on me which is so abusive so as to, in the first month since starting the "competency" proceedings, have uniformed federal employees slam my head punitively 3 times on concrete and once on the back of a van, on two separate occasions, and then when a doctor in Chesapeake detention center evaluated my condition as an emergency and said I should get an MRI, transfer me to avoid this, while lying to Chesapeake and me that they were taking me to the hospital. Just as institutional agreement with Proctor's sick idea of everything being punitive and abusive by default, as a tool to push Proctor's beliefs on me. Proctor spent meeting after meeting telling me confidently and unequivocally about the supposed motives of space aliens flying spacecraft in the night sky, and got visibly upset when I questioned both their supposed morals and great intelligence, by analogy to the atheist argument why there isn't an "omnibenevolent, omnipotent" god. Because I mentioned having seen an unidentified flying object before, Proctor, a worshiper of speculated aliens, who claims up and down all sorts of inside knowledge, when trying to justify the competency

evaluation, floated the idea of trying to say that I was delusional based on having supposedly seen an unidentified flying object (As Neil Degrasse Tyson said, "Key word: unidentified.")).

At the court date where I was assigned Whalen, I wasn't allowed to refuse, because the competency proceedings hadn't yet been dropped. That was the last time that I had a court date, despite my repeated pleading over the months to Whalen to bring me into court, and saying that I assert my right to be present, and my right to a speedy trial. And so I have been continuously unable to object to continuances that have been made on a variety of supposed justifications. I was kept at Butner for, was it 2 or 3 weeks, after the 45 day limit. Because the Marshals were waiting to take me, I'm told they are overburdened, but the speedy trial act says that they have to make those transits in under 10 days, and that wasn't done. And I was still in transit for more than a week after Butner, when they took me, bizarrely, to Atlanta, then back to Butner, then to Petersburg, for a more than a week layover (with no access to my legal paperwork, including my list of phone numbers, so I could not call attorneys, and only one phone call in the entire time I was there). During the last call, Whalen denied having consented when I referened the motion to exclude time, (which occured over my frantic objections, as I had been talking about a motion to dismiss for speedy trial violations, and with me unable to fire Whalen or send a message to the court directly).

And the jail taking my legal work away from me at unpredictable times, taking my mailing supplies away from me, or letting them get stolen by the protections racket that has tried to push me into prostitution on the block or else, and after I made clear that I was willing to fight to the death when cornered by 6 black prisoners in my cell rather than be their bitch, early on, has decided to inflict punishments on me, to validate their assertion that since I'm "a girl and won't fuck", I'm "food", in the form of looting my cell often once a day, for everything from my tablet (which they said they broke down to use the battery to light up), to my clothes, to my toilet paper, instead of outright attacking me, until I did get physically assaulted twice on the block, and sexually assaulted too, by someone who kept coming back in my cell to ask for protections payments afterwards. All the jail would have had to do to stop my mailing supplies getting stolen, would have been to provide me a locker that wasn't broken. (And not disappear my lock which they did when they subjected me to this deeply-abusive trip to the SHU) I asked on many occasions, they ignored me, with the same general institutional indifference and practice of saying they'll get back to me and never doing so, multi-layeredly. (One employee might once in a while talk to someone else, who will give them a false assurance of getting back to them, to pass onto me. And so on.) This has made it impossible for me to mail the court saying I intended to self-represent.

I have been able to send only one letter in the entire time I have been here in FDC Philadelphia, and the guards had taken my legal paperwork with address book and all communications away, so I had no ability to send it to anyone other than Whalen. It took a week of asking the guards over and over again and being told that the next shift would do it, shift after shift, and being provided inaccurate information about how to send the letter, or being told the famous "I'll get back to you", to have my letter sent. And it is lucky I did manage to send it before leaving the SHU, as there is a high likelihood that it would have been lost in the purge of my belongings that occured on me being taken out of the SHU.

There is a distinctly non-random pattern to which of my legal work gets taken from me. Of the notebooks (all clearly labeled "ATTORNEY-CLIENT PRIVILEGED AND CONFIDENTIAL" in large capital letters on front and back) that have been disappeared from my collection of legal work while at

Exhibit 1 p. 3

FDC Philadelphia alone, one of them was my "civil" suit preparation notebook, which among other things, had my journal of abuses inflicted on me in FDC Philadelphia, as well as citations I could use to argue that their treatment of me was illegal. I was retaliated upon for citing Bureau of Prisons Standards of Employee Conduct (SEC), both on those staff who deliberately put me in danger, and any staff in earshot, to remind them that the SEC prohibited failure to report and investigate violations of SEC: A guard whose name I wrote down but don't have right now because of them taking stuff from me, said that if I had any more problems I was going to the SHU, during a Lieutenants' office visit for my situation of the jail denying me my religious vegan diet.

When I was sandwiched between a door and wall and bodyslammed repeatedly through the door by a prisoner, I asked the guard, please let me get my legal paperwork before I go to the lieutenant's office, I'm afraid it will be lost. At the lieutenant's office, they said they were sending me to the SHU for my own safety supposedly, for an SIS investigation to determine if the guy really did it. (Which doesn't make sense, since it would take less than an hour to locate the footage, probably more like 10 minutes, and less than a minute to review it). I pleaded with them to let me retrieve my own legal paperwork, because I was basically certain at least some of it would be lost otherwise. They refused, while obviously falsely reassuring me that they would handle it carefully and get all my paperwork, and I'd have access to it in the SHU. And then "For my own safety" quickly escalated to become deliberately and explicitly stated as for my endangerment in the SHU.

When I was first put in the SHU in FDC Philly, they tried to move in a prisoner to my cell, to be locked in with me 24 hours a day, who was shouting that if this occured, this prisoner would beat me up, and also commented that I would have this problem with just about anyone. Guards present were L Harvey, Ajayi, Brinsson (unsure of spelling), and one whose nametag was torn off. When this prisoner refused to be cuffed up, to be transferred, they ignored what they would later charge me as "refusal of orders" on this prisoner's count, and instead decided to move on to demanding that I cooperate with a transfer of me into this same prisoner's cell, all the while with this prisoner yelling about beating me up. I said SEC says you can't give an order which would put an inmate in danger, I couldn't do that, this was putting me in danger, this was a threat to me. L Harvey said, and I might get the words inexact this time recounting, "I'm threatening you? Not yet. Here it comes, now I'm threatening you." And not longer after, Harvey claimed, apropos of nothing that I said (besides citing Standards of Employee Conduct) "He threatened me!". One of the other guards said, incredulously, "Who, inmate LaSota?" ... No one else present then apparently took seriously the idea that I was a threat to guards, because they relaxed SHU protocol around protecting themselves from me when they transferred me to the holding cell and back to get cleared by psychology to be single-celled. They did not require me to exit the holding cell backwards. There was a large, noisy, blue washing-machine sized air purifier next to my then-current cell (cell 845 in the male-housing range in the south wing of the SHU) (The cell numbers are misleading, since the first number digit seems to suggest a number unique to the institution by naming the floor, but there are for most cells identically numbered cells in the opposite wing of the building) door, such that to be heard through it, both guard and prisoner have to yell with their head at one of three specific points, none of which is the slit window. Making it impossible to look someone in the eye while saying something. But Harvey wrote me up, with a whole false account of the conversations, omitting the standards of conduct citations in favor of saying that I merely said I didn't have to comply, and then added the lie, that I *looked Harvey in the eye*, and *calmly* said, "I will kill anyone who comes in this cell, including you, Officer L. Harvey."

Exhibit 2 p. 1

Counselors Sutton and Cannon later said they were there to read me my rights for a hearing based on Harvey's lie, and ask if I wanted to call witnesses. They cut me short when I wrote as much of the truth of the situation as I had time to, on the first form they gave me, instead of signing to absolve them of guilt for botching the process they were conducting. When I said I wanted to call all the guards that had been present, and I knew the names of Ajayi, Brinsson (uncertain of spelling), and there was one with no nametag, they just wrote "no-name".

It is numbing, bewildering, disorienting, to even write all of this (each time I write, and with all the paperwork going missing, and the demanded multiple copies and computer system designed so I can't read what I wrote and I have to re-recall multiple times for all the staff departments I need to write complaint forms to).
I have many events so far in writing this that should be OIG investigations, that should have accompanying orders for preservation of video footage, that should be civil suits, that should be investigated by the officers' superiors, that should be any motion based on conditions of confinement and the motions I have asked to have filed based on denial of due process.

I am sorry if this is disorienting and unclear to read. This is what traumatic memory recall looks like, I have read. I am unable to write at the moment with any more clarity than this. I don't want to suggest more competency proceedings when I say that. I am able to recount these events at all out of unusual psychological resilience. Perhaps if I had security in what I had written down, rather than the knowledge that most of it had been lost to raids by staff, thefts, transfers to/from the SHU, and even outside of jail, to raids by supposed law enforcement, such that I even had time to write down all the stuff like this I have to say, let alone go through and organize my thoughts, mentally checksum to see what I was missing, but that is not the case, and has not been the case, since I was thrust into this nightmare of abuse under color of law almost a decade ago.

The issues in my case, including the grounds by which I might make a necessity defense, are actually far more deeply horrifically bewildering, stupefying, disorienting, and numbing. Whalen has responded by agreeing to handle issues in my case and then months later reporting no memory of having discussed them at all. (It is not without sorrow that I even mention the issue of a potential necessity defense, since ideally, that would be between me and effective counsel up until if and when I made the defense. However, one of the motions that Whalen agreed to and then claimed to have no memory of discussion of (and which this sentence right here might be my best chance to put into writing from my disorganized traumatized memory and intent to make) was a motion to compel discovery, which would include among other things (such as the sequential numbered folders the FBI omitted from the partial discovery I've seen, and the blacked out pages from the search warrants, one of which in the non-blacked part there is perjury in), electronic evidence, a copy of all the data whether the FBI was able to interpret or "decrypt" it or not, that was taken in the various raids of me and my friends, which includes among many other things extensive documentation we have made over the years of the campaign of death threats, harassment, abuse under color of law at the direction of the Epstein-involved (in the Epstein files over 400 times, their registered-nonprofit president appearing on the flight manifest of the Lolita express) rape-cultists I originally protested, who swatted me as part of direction of Sonoma county to brand me a "defendant" and later a "fugitive from justice", after I nonviolently protested their abuses including abuse of children, and they falsely called in the swat team saying we were going building to building with guns (and a quick look at the history of that case shows we were never charged with anything involving guns, we did not have guns, that was an outright lie. And they blamed us for the trauma that the cops inflicted on children at the venue we protested, in a

far-away school bus, but did not investigate those who made the false claims! And they called us felony child abusers based on that supposed causal link: we nonviolently protested wearing Guy Fawkes masks, they called in the swat team, the swat team traumatized a school bus full of children somewhere else on the property, part of the departing previous event group on the property we never knew were there))

...The history of cultists who have tried to kill me, and have talked about wanting to chain me up in their basements and rape me to death, who have gotten my friends killed, might be part of a necessity defense, and I am saying it right now that way, because I do not think I should have to, or it would be wise to, affirm anything. As an argument why I need that data, for a motion to compel discovery. I move to compel discovery. This is right now the best description I am able to provide of the motion I intend to make I hope that I get the chance to continue writing all the other motions I need to make, I hope I get the chance to sort through my memories for all of them, I doubt that will be possible. Right now I need to go back to frantically typing stuff (who knows when I might be assaulted and my progress lost again. About 1.5 inches-thick pressed tight of a pristine stack of letter sized paper has gone missing in the last SHU move, I can't right now reconstruct how much of my work over the past several months or before was in it.), in order to try to complain/ describe the other motions / assist in them, that am trying to do right now.

I guess I am going to, as a last-ditch effort, all lawyer meetings having been cut short, (the one lawyer phone call they let me receive here at about 30 minutes, by staff tripping on the phone cord and not plugging it back in and restarting the call) hereby ask that Elua, whom I am sending this series of post-SHU updates emails to, put them into a letter, to the Baltimore court, apply whatever formatting and references to case number or whatever is required for this email series to be entered verbatim in the docket and for the motions I mention herein to be noted as best-effort issued before the deadline a journalist (not my lawyer) just told me looms over me for filing *all motions(?!)*, although I would like to have a lawyer that had the stamina and time to deal with this, or to have the necessary time and circumstances to complete them, my continued silence or hope in the system, or saying this through the normal channels, would be against all reason and experience.

Elua, please put this in an envelope and write my name on it (you can write yours too), you can put your address as the return address, I authorize you to receive mail on my behalf to the extent that would result from such use of return address, put full printouts of each of these emails, and include a note saying that facilitation of my letter via email to the court was through your assistance.

Every time I talk to a lawyer it is a stream of horror like this. And many, I suspect, try to convince themselves that most of the motions I have requested are not likely to succeed, without even reviewing most of the evidence available, let alone the evidence that has been omitted by the persecution. (Yes I know the difference between the words "prosecution" and "persecution". In this case "persecution" is more appropriate, because it includes both te "prosecution", and the FBI, which has made independent omissions (to the extent to which the FBI could be considered independent, when it has a representative at the prosecution table many a court date)).

Sutton and Cannon cut me off trying to write on the request for witnesses form, and didn't give me a third piece of paper which I don't know what it was, which they had mentioned they had for me, that day, without giving me time to fully fill it out or even read it. At the hearing, even though I wrote at least the names of Ajayi, and ~Brinsson,

Exhibit 2 p. 3

It's 13:23 on 2026-10-22 as I write this, and the counselor from this floor with a P-something last name just told me my appeal for the UHS hearing is unlikely to be accepted, if I can name only dates and not times when I asked guards for the forms while in the SHU, based on it timing out while I was denied access to forms. And that my DHO hearing appeal is likely to be thrown out for overflowing the less-than-half-a-page box that states reasons for appeal. Said I have 1

They took away my phone as punishment for not submitting to be beaten up or raped or killed I cannot talk to more lawyers for help. (Will explain this later in this message or series, see what McDonald said regarding trying to put me with the guy from the protections racket on 6S, (there are 6 floors with two units per floor where prisoners are housed, so it's 1 in 12 to even be from the same unit)) Sorry I'm really traumatized around the concept of context.

Exhibit 3 p. 1

I accidentally apparently pressed some key combination that caused the Part 2 email to send without confirmation, while I was in the middle of typing in the 2nd and 3rd paragraphs from the bottom.

To continue the 3rd paragraph from the bottom of the last email:
...the hearing officer tried to say that no witnesses were called because "no name" is not a witness, which is just what the counselors wrote instead of taking down that I wanted to call the guard with the torn off nametag as a witness.

To continue the 2nd paragraph from the bottom of the last email:
...said I have 15 days from the 14th to appeal the DHO hearing, because the 14th is when I received the paper back.

Here is the text from the DHO hearing appeal which I'm told is not viable because it is too long (the computer locked the unit out for an hour at approximately lunchtime, so I was interrupted in writing emails and switched to writing this on paper, so now I'm going to collect the things that I have said in that here, and then I guess later try to write a shortened more compact version for appeal. Writing here because it is relevant to conditions of confinement and the climate of retialation and the retaliatory (for bringing up SECs) nature of the punishments that are being inflicted on me which deprive me of due process.):
<
This is an appeal of my hearing on approximately (or exactly) 2026-10-07
My rights were not respected. And Officer Harvey outright lied! I called for witnesses including officer Ajayi, oficer Brinsson (unsure of spelling), an officer present at the scene with L. Harvey, but was told they weren't there that day. I called for the psychologist that evaluated me to be single-celled and the hearing offier brought only other psychologists, first as my representation (I tried to et the warden, then asked for and the counselors wrote Chaplain Bell, when they said I couldn't choose executive staff. Bell said he was just getting up to speed and couldn't make a comment, after being brought in partway through. They cut me short saying I was trying to manipulate the system for asking to be able to read my questions for witnesses I prepared. But it was when I said why are there so many guards with nametags ripped off, becuase I was saying unlike what the counselors wrote, "no-name", I asked for that witness, identifiable on camera, or maybe by asking other witnesses, the counselors (Sutton and Cannon) sabotaged me by just writing "no-name", and ten preventing me from having tme to fully correct the form, and then the hearing officer tried to just say no witnesses were called because "no-name" wasn't a witness, but I did have time eough to at least write "Ajayi" and ~"Brinsson". They denied my right to call witnesses for no reason but [and they stated this] that I asked to asked them questions. [They said on the hearing disposition form that it was against policy to "cross-examine" the witnesses, and instead of just saying no I couldn't ask them questions, they didn't even call them, and they decided not to even call them before I even asked to examine them. (Sidenote: it'd be direct examination if I was the one who called them, right? Calling it "cross-examination" was their mistake, I think.)] Harvey fabricated the charges in retaliation for me pointing out BOP standards of employee conduct violations. Because I said the prisoner they were trying to move in with me, who was shouting the whole time about beating me up if they did, was a danger to me. The charges are implausible on their face because there was a noisy air purifier--[It cuts off there due to being told it will be thrown out for overflowing the box on the form for the reason for appeal text]
If it's over the "appeal deadline" / (I've been told conflicting things) it's not my fault. You cannot use that as an excuse to fail to overturn. This is the first day I have been permitted access to the forms

needed for the appeal. Despite my asking every day or close to, and posting a sign on my door in the SHU for over a week asking, and unit team saying they would give the forms circa 10-10, they didn't.
>

I also want to note, that the only reason I have times for anything in the SHU, was because I stealthily brought my commissary watch in. And they took away everything I had, clothes, pencils, underwear, every single piece of paper, books, other than the commissary watch I slipped past the search process, because I figured that they would abuse me, and that if I didn't have times for the events of the abuse, then they would be more likely to get away with them. I had to hide this watch the whole time I was in the SHU, as anti-abuser praxis, just to be able to document the times they abused me.

Ordinarily everyone in the SHU has no watch, no tablet, and the doors are all along a narrow hall with no clock in sight, and almost every time you bang on a door to ask a guard for anything, in my case most commonly, "I need the appeal forms for my hearings", "I need to talk to unit team", "I need my legal paperwork", "I need to access the law library", they pretend they didn't hear. I have tried knocking as loud as could be done politely, and louder than that on other occasions. They usually just walked by and pretended they didn't notice. It was several days between responses to the sign on my door, and each response was usually, "I can't help you with most of that, but I'll ask the property guy" or something like that, and then never getting back.

So it's egregiously abusive that they would make knowing the exact time of day, in an environment where they punitively have glazed the window behind the grate so you can't see outside, can't have any sights beyond the cell to stimulate your mind, and generally mess with your sense of time, don't give you any way to know the time. That they'd use failure to record the times (when they don't give enough paper to write most things down anyway), as a general excuse to make their outrageous hearings unappealable.

(This isn't necessarily the 3rd/4th/7th-floor counselor named P-something's fault, maybe that was just an accurate report of what those who accept the forms would do, except, this was a BP-8 handed to me for the UHS hearing which this was a convo about, because the DHO hearing is definitely not expired, and is the counselor the evaluator for the BP-8 form? I don't know. I'm guessing not.)

But it's the kind of thing that would be hard to account for in advance unless you had experienced the SHU. Just like every single employee throughout the day ignoring you when you ask for any sort of routine thing that only they can provide, such as the forms to even file an appeal. There's something core to understanding the injustice system, that they would take *every* opportunity to make something a battlefront of punishment and that they would all do so confident that they would get away with it for one reason or another. Like, who would think it would be necessary to their strategy of injustice to meter access to the forms someone was allowed to make requests on according to who was popular among the guards?

This another example of denial of due process that pertains to the motion to dismiss for denial of constitutionally-recognized due process, which is not limited to :
recognition of ineffective counsel.

In Butner, a lieutenant, Sierp, made a death threat explicitly addressing the entire unit I was on, based on us not turning in the smokers among us. I immediately did everything I could to see that Sierp was

brought to justice, I wrote it on the "request to staff" form on the computer, I gave the unit guard (the only member of staff that I was able to talk to then, with all of us locked in) preservation notice for the footage, and said to forward the preservation notice to whoever manages footages for the time and date and specified the exact cameras and specified that all audio was to be preserved as well. (There were visible standalone microphones in the walls, and I was told that the newer model of, so some of, the cameras dotting the ceiling, had built-in audio recording.). Then I was told that I needed to file a BP-8, and that I could only get this by asking the counselor, who wasn't available just then but I could eventually find, and Counselor Malone said I would be given the BP-8, and then said actually since I was making an allegation of criminal misconduct against a member of staff, I needed a BP-9, and said don't worry, Malone claimed to be going to give me a BP-9 by a certain date, was it the next day? Then Malone didn't. And this whole thing was a farce because PLRA was written to suppress "civil" litigation against prison staff, not to suppress complaints of criminal behavior on their part. And then before I could locate Malone or any other counselor again to ask for the form, I was shipped out of Butner, and as soon as I got an attorney meeting, with Whalen, after the brief minute-or-so to talk in the courtroom, I asked Whalen to give me a BP-9 form so that I could make the complaint as Malone asked for. Whalen never did. Whalen was my appointed federal lawyer! Whalen was the closest to anyone whose job it was to get me that form, in a unique position of being able to. Schram&Lamm were already overburdened, and I didn't hear from them, and I think Whalen agreed, to get me the form and then forgot about it. The state jail I was in didn't have them, and no one but a lawyer was allowed to mail me anything I could write on. (ACDC had apparently intercepted some of my mail, and, even if it let it through, gave no option to print it, only showing you the image on the tablet. And they read my attorney-client privileged mail right in front of me, and took out pages written by my lawyers, on their law office letterhead, summarizing the motions/docket entries they were sending me, and they said that was not legal, and they read it to see what it was in order to determine that. The guard named Hill I think, the one with the very pockmarked face, did this, and Lt. Gilpin commanded it. And Gilpin called me a "shit-stirrer" and talked about wanting me gone. Gilpin had already committed many other abuses and defied court orders for due process from Judge Twigg in the state case. Overall, aside from providing the vegan diet relatively quickly, and giving me a reduced measure of the ordered discovery access, and for occasional eventual joint defense meetings with codefendants, ACDC has been worse for due process. The most significant reason being that the tablets crash out of the law library there every time a page fails to load, and the internet is super spotty, so the law library is mostly unbrowsable, or at least it was in the cells I was in. And they put me in the hole for long periods and barred even legal phone calls.)
And this lead into the whole saga of being denied forms here. Denying us forms is their get out of anything free card.

(Note, I woke up shortly after the counselors in the SHU said they would give me the forms, to paper sliding in my cell's door frame. But when I sat up and opened my eyes to look, there was nothing there, and when I got to the door to see, there was no one visible in the small stretch of hall. At the time I figured the noise had probably been a kite (in prison, this is a method of sending messages / small objects, with a pouch/envelope on a long string, which is thrown through the bottom of the door. Often you see/hear kites appearing and disappearing as prisoners miss the door they were aiming for, or are hoping you will re-fly their kites to another door or something like that.), which makes a similar sound. But, in retrospect, since I never got the forms, it's possible that they did put them in the door, and someone else, perhaps L. Harvey, perhaps Lt. T. McDonald, took them away while I was asleep to prevent my appeals. You absolutely cannot put such things past United States prison staff. Or "Federal Detention Center" staff.)

(If anyone cares to investigate to enforce the law among the lawless staff of an American prison, I think that one of my currently surviving legal notebooks has the date and time and a copy of what I wrote exactly about Sierp.)

Note: up until I was in the SHU, FDC Philadelphia's line, as per the 6th floor counselors, was that there were no legal calls allowed. In the SHU they normally capped legal calls at 30 minutes, and required that they be scheduled days in advance.

Exhibit 4 p. 1

Despite Psychology first saying it was allowable for me to be single-celled, and then saying it was recommended, and then saying it was needed, a lieutenant, probably Lieutenant McDonald, overrode what had been decided by guards the first night, and tried to put me with another cellmate the next day. Seeing my feminine curves (I was fully uniformed of course), and that the velcro to hold up the shower curtain was broken (it's apparently broken in almost all cells, some have been jerry-rigged by prisoners with sporks and threads torn out of blankets, jammed into cracks pent open in the metal surrounding the shower which I was unable to do), and anyway the shower curtain is designed for male prisoners apparently, and is transparent at breast level. The guards had ignored my complaint about the prospect of celling me with anyone: would they want to be locked 24 hours a day, as a woman in a cell with a random man from the SHU, out of earshot of any guards, forced to strip naked for the shower and use the toilet in front of a man, when the jeering chorus of prisoners when I entered the SHU had reinforced the claim of that guy yelling that I'd have the same problem (of getting beaten up) with almost any other celly. The new celly they had brought to move in said "This is against my religion.", and the only prisoner the guards wouldn't give a right of refusal on a cellmate to was me, so they brought this prisoner away with no indication that they would enforce their "disobeying orders" thing. The cellmate that they wrote me up for refusing orders for refusing to be celled with, not the first one who yelled about beating me up, and not the second one who refused, was, and I'm increasingly confident this one was McDonald's selection, one of the two guys that directly tried to approach me for money as part of the 6S protections racket.

Elua, can you please send on a complaint to OIG about the Sierp incident? OIG should be able to read the request to staff that I made. Tell me if you think it is worth my time to dig out my records myself. (But it seems like no matter what happens I'm going to be short of time to make necessary arguments on multiple fronts.) Actually maybe set a calendar date to do that by default (I keep wanting to write stuff down because they might destroy any of my paper records at any time.)

You know, accumulating too much of a backlog of things that have happened to me, outstripping my ability to cogently speak about it and publish about it, I think was part of the success of John David Pressman, Eliezer Yudkowsky, et. al. in causing deaths and the disappearing of information on their crimes. So when I ask myself how I feel about what's in my head compared to what's written down on papers that could be taken, and just now when I read that Truth's being told by Bruckner that they're going to murder her on "extradition", and think about the forces pulling them to, that actually makes me feel more urgency to say what's on my brain before I no longer can.

Whalen claimed to be coming to meet me "As soon as possible", back in September. And the best I got so far was a call yesterday 2026-10-21, for about half an hour, with both of us trying to say things, and me speaking as fast as possible, until cut off. It was a similar delay and a similar premature cut-off last time.

There is a concept that I think of as "trial by reality". Suppose that evidence is destroyed that would exonerate an innocent person, what can they do? One way it could end, is that, even in a jail, in conditions far worse than I have described in this series. (After all I have been sending updates for months, and far worse stuff has happened before that when I didn't have the ability to take records or type emails. The ability to type on a keyboard, and have the message very likely go through rather than being dropped as often as ACDC, is a huge quality of life improvement.) being innocent, being free of the self-destruction inherent in guilt, they might endure. And being guilty, their captors, and those who have removed that exculpatory evidence, their captors would be committed beyond the possibility of

stopping, the self-destruction inherent in guilt. Just like the fascist regime that has murdered my friends and many others decided to ignore Economics 101 (nominally a Republican-aligned field of study) and institute tariffs, has been an act of self-destruction inherent in evil. And that has robbed it of some of its momentum to continue the push that has done this. And against many expectations, despite the psychological torture, the daily grind of all my requests going nowhere, my records being destroyed, attorneys pretending stuff didn't happen, I am still sane. Gary Proctor failed to make me insane. When Maryland State's attorney in Allegany County James Elliott, and associates including the FBI, committed crimes that my codefendant "Zajko" documented, first she was tested, in that she had fellow prisoners trying to subject her to "exorcisms" for her not taking a plea deal, threatening her with assassination, with poisoning delivered via her vegan food trays. And these tests were designed to break her. And when they didn't, what did they achieve? In the longer run, they were counterproductive. In the long run, the motion to dismiss that she filed probably mattered more than any impact on her of the original threats. This is because criminal thinking such as the thinking of the organized criminals of the FBI that came up with this sort of plan, contains a built-in time limit. It's all short term thinking, just of different scopes. And they always bet on us taking plea deals, on us breaking, like e.g. Aaron Schwartz, and they are unused to people who do not give up. They do not practice to handle innocent people. Innocent people go on to exhibit an absence of self-destruction, which makes us stronger over time, and their guilt makes them weaker, because they go on, after bringing cases against us based on lies. It's easy enough to try to rig a "trial by reality", and push some of yourself into it. After all, so much of what happened to me has been undocumented. And it's not like I'm currently stronger for much of it in any way I can see. But, reality always comes from every direction. The FBI probably figured it could only be to their benefit to have someone like Bruckner doing the things that it did, that it would not come to light, that they might as well have that going for them. And the sorts of abuses that I am subject to are more than most are. It is always better to be good, no matter how much evil may target you for it. For instance, when SIS (I think "Special Investigative Services") from FDC Philly investigated the assaults on me, a representative, with a torn off nametag, (white, male, shaved-stubble of short grayish hair, mostly bald-ish), identified when asked for a name only as "Izzie" (Not even a first name, a nickname. Clearly someone savvy as part of an abusive system where not having a nametag makes you immune to complaint), "Izzie" commented on the protections racket I had complained about, saying there's sharks on every floor. Said kudos to me for not paying them, that I was "a real one" for that, and asked how much did they demand? I said one of them asked for $30 a month, then another asked for $100 a month. "Izzie" seemed shocked, saying often they charge $1000 a month for protections, saying they offered me a good deal. No they didn't though. Not that I realized it during the conversation there, but the reason is most likely that they increase the charge over time, having proven what they can get away with, and created an ever larger incentive to squeeze you with everything that you give them. Izzie said the first guy that assaulted me didn't get a shot. (Even though it was confirmed on camera) (Oh, a "shot" is a "writeup", an "incident report", a filing for a hearing for extrajudicial punishment (the hearing officers usually stress that it's not court) of a prisoner for something like refusing orders or assaulting someone.) And the second was already out of the SHU and back on unit 6S long before me.

Anyway, I didn't pay out to extortion on principle. I told the collector racketeer, that sexually assaulted me (claiming afterward to not have self-control while on drugs (bullshit)), "I'd rather burn a million dollars than give you a penny." And, I didn't even think about the way they'd escalate in those terms, but I am safer than I would be for it. There's this field of philosophy and math called "decision theory" about stuff like formal reasons not to pay out to extortion, and Proctor, in one of many accounts of why I was supposedly incompetent, said that it was afraid I would practice it. It's been hammered upon me

year after year, that I'm self-destructive for not falsely pleading guilty, and, the reality of what's self-destructive and what isn't isn't something for "Man" to decide. Is not something for social consensus to decide. And, resisting Proctor's pressure cost me several brain injuries. But, a trial by reality disposed of the state case via stet docket, after I was told that I would never get an offer as good as the plea deal that Elliott offered the better part of a year earlier. And more importantly, I feel a loss of momentum overall since the beginning of this nightmare. They continually do more abuses, and they continually make mistakes in being more blatant than they intended. If at any point I was not being abused on many fronts, the whole thing would start to collapse, and, suddenly, someone like Sierp might be punished for abuses that seemed to be done behind impunity. From months ago, which such a criminal mind would have written off as past the horizon of impunity.

Speaking of which, Elua, actually please just send the OIG complaint since I probably don't have time to divert from other abuses to retype anything, and I already typed it up for the BOP once.

I have been enduring a brutal trial by reality for years of torture. Sometimes physical. Jail medics usually, I've learned, refuse to make record of bruises if they think they are inflicted by cops. Omertas.

When I got to FDC Philly, I was told by psychology that anyone could be suicidal, there was no one knowably non-suicidal, single-celling was dangerous for everyone. In the hole (aka the SHU/"Special Housing Unit"), and, the irony was not lost on me that they were telling me to harm myself by putting myself in cuffs to be beaten up by a man yelling about doing exactly that, or to be locked with perhaps the guy they should have most been trying to separate me from if they were sending me to the SHU for my safety.

Lt. McDonald, in response to my refusal of such self-harm, started saying that I would be sprayed (a corporal punishment, with anti-riot weapons as a pretense. A souped-up version of pepper spray that leaves everyone having trouble coughing on a unit, even with cells that have separate air supplies. Guards usually wear masks even outside the cell with the spraying. Jails routinely demand prisoners put their faces at the soup hatches on cell doors to be sprayed in the face, or spray prisoners in beds.) Said that I would be put in 4-point restraints and sprayed, and put with the celly anyway. Said the guards were going to "team" me. (Team me they did, when they colluded via the strategy of omertas I have described to a degree, to deprive me of appeal forms, etc.) It's punishment I've seen many times for prisoners to be shackled for hours in order for guards to watch them shit and piss themselves.

Lt. McDonald said that I was going to be in the SHU "forever" for refusing. I explained the violations of SEC, including retaliation for a report of Harvey's misconduct, "orders" endangering "inmates" and failures to report or investigate such, and that Lt. McDonald, by failing to report and investigate them was also committing violations of the SEC, and Lt. McDonald said, "Did you think of that on the streets?" I asked, "Think of the Bureau of Prisons Standards of Employee Conduct on the streets?" Lt. McDonald ~repeated, "You should have thought of that before you did the crime!" I said that I have committed no crime. I am innocent. And that Lt. McDonald was violating the presumption of innocence. Lt. McDonald, despite waiting until I finished saying that all, and clearly hearing it all, continued saying, "So I just pray to God that you get what you've got coming.", and walked off without allowing me to finish. McDonald commanded me (another "direct order" as though I were a slave) to take a nonvegan tray, during this incident.
McDonalds's threats were minutes before 16:45 on 2026-10-04.

Afterwards I banged on the door and asked for help from a passing guard.

They have already punished me for more than the amount of time I'm told would be the recommended sentence even if convicted in this case.

Exhibit 5 p. 1

(By the way, I was still in the "845" cell I mentioned at the time of McDonald's recently mentioned statements)

(However, McDonald's demand that I take the regular tray was only a bluff. Even with "all the power in the world", seemingly, as a Lieutenant, and me in the hole with no one to hear my screams, writing me up for not eating meat would have looked bad.)

I told the passing guard, "I need some kind of help because I"m being abused and endangered here." The guard, with a nametag, "J Spe[--]" (I didn't catch a glimpse of the whole nametag, hair or jacket in the way as often there is) (black, female) (not to be confused with another white female guard named "Spe"-something.) said: "Okay, watch out", (closed the hatch and walked away.) Not long later, I asked at 17:39 (still the same day), another guard, Worobiec. And I said, "I'm being threatened by Lt. McDonald". Worobiec repeated twice, "You are not being threatened". Worobiec then started walking away, before yelling back at me, ~"You are being told what is going to happen."

So, McDonald was informed of a threat to my life, and expressed intention that I be punished as if guilty. All this was explicit, and it was on camera. They say there's no audio. I don't know if that's true. I hereby move for a subpoena for video and audio footage of all my time in the SHU, and for any footage that might be relevant to any of the abuses that I have suffered here to be preserved. If it's already been deleted, it's on the jail, because they acted deliberately to retaliate against me for making reports of SEC violations.

Elua, I don't know if they will let you, but I would appreciate a paste here of the reports that I made in pre-SHU episodes of this chronicle, especially the ones about officer Akram trying to get me to fight other prisoners to take their food, and declaring it to be even funnier than me starving, was that the wording, that I was getting my commissary stolen?

A lieutenant trying to have me locked up alone with a (very muscular) collection man for the protections racket that targeted me, betrayed the intentions to lock me in the SHU in accordance with previous threats to put me there if I continued to complain. (Elua, can you attach the reference please? Since I no longer have my records of that). This is why I was putting ~"for my own safety" in quotes.

McDonald's clear expressed intention was to deprive me of the right of the presumption of innocence unless proven guilty. To punish me as presumed guilty, even putting me in physical danger. "Coffin v. United States" records the United States's recognition of the presumption of innocence unless proven guilty as a foundation of due process. McDonald has taken action that has interfered with my ability to litigate my case on any front. Generating delay, and the other guards who have committed egregious injustices against me. As I have hastily tried to document, hastily due to the lack of attention my case got from Whalen, the abuses I have suffered have made it practically impossible for me to litigate my case, or even to discharge counsel to have that be considered a problem by the court.

By the way, did I say bodyslamming me through the door before? I think I could make it more clear: the door was in motion, carried with the prisoner doing the bodyslamming, not left rammed up against me. It was like, a use of the door as a metal riot shield to slam me, aided by thrown body weight, again and again against the wall.

Exhibit 5 p. 2

(Sorry about the paragraph organization, where they could perhaps be ordered better. There is no cut-paste on these computers. No way to re-order text once written, except by deleting and re-typing it. And the things I need to remember to write are continually drifting in and out of my ability to remember.)

Because I have been here longer than the "recommended sentence" even if "convicted", I have *in effect* been presumed guilty. And I have suffered much more than imprisonment. Mere imprisonment would mean I could just sit down and read some books. This a constant seemingly unwinnable hamster wheel of the forces of evil taking my memories from me in the form of my writing, be it paper or electronic, and drowning me in new abuses. Like the Red Queen's race in Alice in Wonderland: run as fast as you can to stay in the same place.

What I have suffered would convince anyone not to expect justice from the United States. When I say that the United States is an organized crime ring, this is not some. And the appearance that due process of justice is unattainable to me is someting that makes itself real, because every day I am forced to triage between who knows how many fronts on which things of sacred value are being taken from me. Not just a lifetime of my writing and work, which, Proctor, after agreeing to push the motion to compel discovery, just said the FBI doesn't want to give me "because you could commit crimes with it". Not just the justice that could have been enabled by the evidence that I have collected against the rape cult of Eliezer Yudkowsky, Michael Vassar, et al. But day by day, my friends' lives. I see the chance that I can save them from the evil that has targeted them slipping from me too. There's a concept in philosophy called a "performative statement". They usually give the example of saying "I do" at a wedding. A self-executing statement, that can't be fake, because it makes it so. Inflicting abuses on someone like those inflicted by McDonald morally and practically and inevitably necessitates that they triage against hope of due process, which in itself invalidates the actuality of that due process. If you make a defendant against a criminal accusation wear a shock collar and zap them every time they say something useful in their own defense, even if your process would otherwise be fair, even though it would by some theory be possible for them to tough the pain and win the defense, they cannot, must not, ignore the fact that you have been, the whole time, hitting them with a shock collar as punishment for revealing their innocence, and that that in itself has a meaning of "If you are innocent it will be worse."

Because I am innocent, it has been worse, for me. That is clear enough even in the amount of time I have spent in jail. (Of course, like the ballooning extortion demands I mentioned in relation to the SIS officer's comment, it would be no help for me to, from who I am and the position that I'm in, to hedge a little against ethics. I never bothered to think through whether I would see any benefit in this life from refusing to pay out to the protections racket here. I simply chose not to be complicit in them, and the harm they would wreak on others, incentivized, enabled, emboldened, if I paid them. Everyone has to draw a line somewhere or they are a slave.)

Because I am innocent, a stranger under a pseudonym of "Rengress" approached me and my codefendants after I was swatted and demanded that we take plea deals. Knowing, as anyone who read the self-evidently false news articles repeating the charges could tell. (Going building to building with a gun, but no guns, and no bodies) And when I said no, I don't think I will do that. Rengress threatened me "for my own good", and threatened to invent false charges and send them to the prosecutor. Read what Zajko wrote, about informants working with the FBI threatening assassinations over this strange obsession that we take plea deals. Like someone showing up to demand that a boxer throw a fight, take a fall. Perhaps over something like "bets" on the contest beyond our knowledge. And when we don't

comply, they have spread lies about us that have lead to some of us dying. The cult we protested, which has called itself the "rationality community", was the origin of the "alt-right" movement. The country's swing against trans people was substantially downstream of the "rationality community"s reaction to us, because our protest, in revealing their sexual abuses including of children, lost them about a million dollars of funding that year, which was probably worth more in terms of the common knowledge it created. And the MAGA movement filled the country with fascist "ICE"/"DHS" agents, drunk on Trump's inauguration and stoked to get the party (of the new Holocaust, with a new focus on trans people) that they were promised started. And they shot my friends. I used to talk about the Holocaust with one of them, a transgender Jew. And we talked about warning signs, survival strategies, when various things became obvious, while watching the country be taken over by new fascists. Now she's dead, over a supposed error of a supposedly invalid visa. The United States murdered her. Tracked her down for nothing, and murdered her. I will not forget. We have all probably seen the United States blowing up girls' schools, and Venezualan merchant boats, for spectacle.

It's like those lyrics from Rage Against the Machine: Wake Up, discussing the assassinations of MLK and Malcolm X under the FBI program, "cointelpro". "I'll give you a dose but it could never come close, to the rage built up inside of me." That is the tip of an iceberg, of how much necessity I have to consider the United States to not be justice. To know better than to think there is safety in innocence, inasmuch as that's the decision of the United States, as opposed to despite the abuses the United States tends to commit, by trial by reality.

And when the cops tortured us in Sonoma county, and were then allowed to delete the footage, that was a learning experience. Another friend of mine, the love of my life actually, now murdered as well, commented after the experience of the torture, that they must be betting on utterly breaking us on the first go, that no one could possibly survive to respond to the betrayal, otherwise they wouldn't have done it. In a sane world, whatever was left of record from that would be an exhibit attached to this. Elua, I don't think there's time though.

Exhibit 6 p. 1

Proctor had agreed to an entire strategy to get the digital evidence the FBI was witholding, including sending in our own forensic experts, which Proctor said was our right, to make copies of the drives that they took, and refused to include in discovery. And then just backed out of it saying that the FBI wouldn't want that, and some nonsense about "because then you could commit crimes with it". Our own data! Proctor folded to FBI pressure in advance, and I think it is common for state-appointed lawyers to fold to state interests in advance, and omit motions. Whalen has taken this to the point of absurdity, meeting with me infrequently enough to prevent me from even having the time to describe most causes for a motion to be filed, until I'm presented with a deadline and most of the given time is gone. Who can blame them, when the FBI sits on the other side of the courtroom, the FBI that killed Martin Luther King Jr.? (And that is a fact, as found by an American court decades later.)

"Black Messiah [...] He [(MLK)] may become a real contender for this position should he abandon his supposed obedience to white liberal doctrines of nonviolence, and embrace Black Nationalism... Through counterintelligence, it should be possible to pinpoint potential troublemakers, and neutralize them."
...I can blame them, and I do.

My codefendant in the state case, "Michelle Zajko" (I shall call her by her religious name, Truth), filed a motion, which I joined, to dismiss for malicious prosecution, based on Elliott's collusion with the FBI, "confidential informant", but I should say "agent", because Bruckner did more than that, delivering threats to Truth. I believe that given the close cooperation between the "prosecutors" in this case with the FBI, they are tainted by this conspiracy as well. In any case, Truth is a witness in this case, and the FBI has engaged in witness tampering. I feel it is necessary to import the parts of that motion in the state case to this one that can be applied, as well as the motions to dismiss based on the denial of due process, based on ACDC's, especially Lt. Gilpin's, continual interference in attorney-client communications, search and siezure of clearly labeled legal notes (some are in the discoverey). I so move. Because my appointed counsel has failed to advise me on what the court may be able to offer as far as investigating, through methods including subpoenas of the FBI, this witness tampering and intimidation, upon a witness for the defense, or how I might compose motions to represent my case to the court that such action is necessary, I find it necessary that I abandon hoping in having such discussion within attorney-client privilege, and seek the court's advice on what to do about witness tampering and intimidation by the prosecution and allies. What should I do? Elua, please incude Truth's motion as an attachment.

Also based on the events described in Truth's motion, which I have testified to (this can be found in the records of the state case), and similar events, and on the ever-looming threat of the disappearance of whatever legal work I produce (unless I immediately send it upon completion over monitored jail comms, as I have found it necessary to abandon hoping in doing other than right now.): My time, during which the government has held me longer than the expected punishment were I to be "convicted", has been wasted through no fault of my own, by the government making it nearly impossible to make progress working on my case. And it is impossible to enjoy attorney-client privilege, or initiative in the legal strategy that I intend to pursue. For instance, I spent some time preparing cross-examination questions, on paper. How many times has that paper been searched, scanned while it was separated from me, as the feds so often have for long periods of time, and an electronic copy sent to the FBI, which the prosecution may be reading? They may be preparing their direct examination questions to lead the witnesses to counter what I have said. Through Gilpin et al's overt snooping on attorney-client communications, of which the FBI is well aware, and is okay with

enough . Proctor advised me not to discuss anything of much content during meetings by phone, because despite all assurances it was not being recorded or monitored, it probably was. And as per Snowden's revelations, it's not even a question of *if*, but *by whom*. Could the FBI call on the NSA to retrieve any attorney-client privileged conversations that were recorded, including by computers in the room we were given to meet? In practice, given the level of collusion and omertas that I have seen between the various abusers in the last 2 years, probably. So what Proctor said there isn't even wrong. But, it's better to write things in the clear than not at all, very often. It's better to shout to the public than give them the option of erasing that information by erasing you, as the regime has erased my friends. Having this entire time been faced with the setbacks, interference, and prevention from doing work, of my papers getting raided and other such abuses: delays of speedy trial considerations, in order for the government to do *that*, which is in practice and in truth what these delays have been, were NOT in the interest of justice. Therefore, my speedy trial rights were violated.

Also, this is an argument there are constitutionally-recognized due process rights which provide an independent from the "speedy trial act" vehicle for a dismissal argument. The denial of due process by an extended period of abusive circumstance that has prevented legal work that I could expect to keep has irreversibly denied me due process, by irreversibly denying me the enjoyment of the presumption of innocence. It has irreversibly denied me the right to not be punished if I am innocent. And, every delay stretching all the way to the beginning has resulted in more time for me to be here being punished as presumed guilty by e.g. McDonald who said it outright. Every delay has not just been a due process issue in and of itself, not just been a due process issue in terms of the time itself, but in terms of the results, which have been varied and horrific. Injustice untreated has compounded. Thus the speedy trial act alone is not adequate to capture the due process rights which have been violated.

To bolster the subset of this claim of speedy trial violations which are covered by the speedy trial act, but hopefully, and probably, say some things that are also relevant to the broader claim:
I'm told Barker v. Wingo specifies a four-factor test for speedy trial violations.
Length of delay, reason for delay, assertion of the right to speedy trial, and "prejudice" caused by the delay.
I have been told that me suffering impairment of memory while suffering malnutrition (I hope some documentation for this which I have previously emailed out so that it could not be destroyed, thank goodness, will be attached by Elua.) is considered "prejudice", in the form of "prejudicing the defendant".
I guess this is an unusual use of the term "prejudice"?
If someone had otherwise asked me to argue what might prejudice a defendant, and there I was in the SHU with basically no access to information outside of my own mind to plan a defense, I would think of the "trial by reality" the state was so known for inflicting: make someone suffer until they have been held for longer than the possible sentence, and then offer a plea deal for time served. Or make someone suffer until they psychologically collapse and will confess to anything. Something that would make the defendant biased against their own case. I would have said that any time anyone takes a deal to plead guilty, that would be prejudicing the defendant. Just apriori. Or any time that the defendant is approached for a plea deal, as probabilistically prejudicing the defendant insofar as th proceedings themselves stem from the belief that the defendant may be guilty, which they would not have any validity if they didn't.
But! I guess the idea of this use of the term is that it would negatively affect my capability to defend myself if I forgot something of relevance. A concept that encompasses capability and not just motivation.

Exhibit 6 p. 3

So: as to length of the delay, it's been substantially longer than what I'm told the "prosecutor" believes I am to be sentenced to if convicted.
Assertion of the right: This is on record last year. I do not have the date off hand. I have not waived my speedy trial rights.
Reasons for the delay: abusive circumstances have prevented me from being able to hold Whalen to a standard of doing much to prepare motions, or even hear what I have to say long enough to understand all the issues in my case, have prevented me from discharging Proctor, whose actions were tainted by a complained of but unaddressed at the time conflict of interest, and Proctor's beginning of competency proceedings was to the best of my ability to discern because of this conflict of interest. Competency proceedings were extended by the psychologist going on vacation, by the Marshals taking longer than the alotted time, and as I have said before, the time was used to subject me to this hamster wheel of not being able to speak to the court for various reasons, meanwhile abuses that I was in the same stroke prevented from stopping have prevented me from preparing much of a defense, which cannot have been in the interests of justice. And Whalen acted against my explicit instructions, without any communication to me, I'm told, in agreeing with interests of justice time exclusions. I contest that agreement on grounds of ineffective/countereffective counsel. There is precedent for this in I don't remember the case (Elua, I think you have it, what was it? You could add a note with the answer in the attachments maybe?): also I-don't-remember-the-case said that the defendant *cannot* just waive speedy trial, because interests of justice affect the public too. (Elua what was that? Also attach?)
Prejudice: In addition to what I said earlier, it's resulted in damage to my health, including cognitive damage, damage to my livelihood and ability to push back against the injustice affecting my life and make room to work on anything, and that injustice will not go away all of a sudden just if I am released. (May need to continue in another email due to character length limits and text already typed below not reorderable)

By the way, what the counselors told me about filing the appeal is in contradiction to what's on the paper. It says a procedure for making attachments, and talks about typing something (of course you cannot print into a pre-formatted form like this except perhaps with some sleight of hand and cooperation from the paper orderly)
(I think by the way, when I think of "trial by reality" as a philosophy of defense strategy, I mean essentially this: judging innocence and guilt is inseparable from judging good and evil. There will always be, more than a criminal, be they the accused or accuser, can account for, opportunities to make a choice between good and evil. And, that means, that even if the information is destroyed in one place, it will recur. When in my DHO hearing, the hearing officer gave a bunch of false information (a violation of SEC), and said that me trying to ask witnesses questions was me trying to manipulate the system, and gave that in the report as the sole reason I was not allowed to call witnesses, that was the truth recurring. Because evil doesn't just do the one act of evil in a contained setting. It continually does more evil. Like McDonald was being sadistic, Akram too (see accounts I hope Elua attaches), and sadism is an inherently imperfect thing.) And it continually has to screw up more hearings and procedures, and sin against more standards to cover this continual flow of acts of evil. Meanwhile, good doesn't, and that builds an advantage.

I want to give a hint of how much abuse has been left out of this documentation. I'd guess that for a normal prisoner, 90% if not more, of interaction with detention center staff is with officers below the rank of lieutenant. A high proportion of those staff I have named across 3 institutions in this letter via electronic mail, have been lieutenants. Certainly weighted by seriousness of complaints. This is substantially because of my philosophy of preferring to focus on the greatest evil, and a higher ranking

staff member, abusing a greater power, is prima facie a greater evil. Most staff are below the rank of lieutenant. I am always having to triage which names I am able to remember. After every incident, I have to triage writing things down and responding to that incident, and I frequently forget names, but I have prioritized remembering the names of those in charge. The proportion of lower ranking guard interactions can be considered in estimating how much I have left out.

Exhibit 7 p. 1

Doggett v. United States says prejudice is presumed from long delay.
(You know, I spent a bunch of time/money making printouts of these court cases to be able to read them if I got sent to the SHU, but then they wouldn't give them to me.)

I move to have our own experts able to independently forensically examine all digital devices to make copies, because I know that they took more than the data that has been reported. I move for the court to provide for this because, all of my possessions having been copped, (the literal meaning of course being "grabbed"), I have no money or income to do so.
I believe there are well over 100TB of drives.

I believe I need to represent myself because it seems like that is the only way I am going to get to see any discovery. One of Whalen's "forgotton" issues was to get me discovery access. FDC Philadelphia has discovery computers, where I see other prisoners with flash drives, on the units. Nothing special has to be arranged. My transfer from ACDC shouldn't deprive me of discovery access.
I move to see all discovery, not just that which was exempt from protective orders because it was already disclosed in the state case. This, as with the forensic experts, was something Proctor committed to do and which I thought Proctor was spending the time doing, but then shrugged off with no more explanation than the FBI didn't want it, as if Proctor represented the FBI rather than me.

And if you [note: I think after I said to send this to the court, I shifted to addressing by "you" the court, whereas I think earlier updates emails would have been addressing Elua if I said "you". I don't think it's likely to be unclear I just want to address that to the extent I'm able right now.] think to make it my problem the disproportionateness of how much evidence there is to review, relative to the scope of the charges consider this: I have had hundreds of FBI agents poring over every detail of my life, scrutinizing and commenting on purchases of guacamole. Going over this massive quantity of gathered data looking for any way to charge me, for years. When I go to the FDC Philadelphia and observe multiple cases of criminal behavior from staff, I am not going over their lives with a thousandth the fine-toothed comb that the FBI has gone over my life: all with a bent towards selection/omission in order to charge me, rather than exonerate me. (Almost anyone would have cases built against them for a proportionate number and severity of charges, and that is the true orgin of the disproportion. And it corresponds to this being a sliver of a life examined where I am an exceptionally morally clean person. I truly mean it from the bottom of my heart when I say I have done nothing wrong, and a mountain of context of exculpatory evidence is being filtered out.) Discovery rules (which I hope to have time to read (and would have been able to if not for the abuses I have mentioned) before being forced to argue discovery related motions), exist, and I believe require the prosecution to turn over all potentially usable evidence to the defence, near the beginning of the due process. I have already litigated this in the state case, and the government has issued a great number of sanctions in response but stopped (so far) short of successfully squeezing out of the FBI the actual evidence collected. I am told the FBI would not likely comply with a Maryland court order. I have also been shown that ACDC, under Lieutenant Gilpin, would openly in court defy a court order without any punishment I am aware of. I wonder if this federal court has more power than that. I move as I have moved in the state case, and I note that I should have had counsel by now go through those records to collect those arguments and present them to the federal court, in order that the FBI may be federally subpoena'd for that information. I move to so subpoena the FBI. I move to include in the federal case a repeat of my joiner of Truth's motion in the state case where she so eloquently argued about the significance of omission. We need all the evidence which has been reviewed pursuant to finding ways to call us guilty. It is only fair that we should be able to review it for exculpatory evidence. And it is relevant for another reason: I've been warned that the

feds use a "good faith" argument against our suppression motions. We have already located easily provable perjury, which would be a defense against such an argument, within the applications for search warrants that were used. From the tiny portion visible with pages and pages blacked out. And we haven't gotten everything unredacted. The FBI's bad faith is cloaked in the same shroud of secrecy under which they killed MLK for having potential as a "Black Messiah", and others. (See the wikipedia page for COINTELPRO) I cannot have a fair trial if they are allowed to be presumed to be in good faith, and that shroud of secrecy is not torn down. For the court to develop a reasonable opinion concerning whether the FBI was in good faith, would require a courageous and thorough review of the sort of history that is often conflated with conspiracy theory, the kind that goes hand in hand with tearing down in your own heart the image of the United States as other than an organized crime ring. In strict truth, the FBI has acted to develop a conflict of interest between anyone who works in or in transitive cooperation with the United States government, and it is reasonable to expect any judge who is part of the federal government to subject to this conflict of interest. I find it necessary to ask the court's advice, since counsel in my experience has had nothing more to offer than helplessness, regarding what remedy I should pursue in light of this, and how I should do so.

I am a person who, even backed into a corner in the SHU, with years and years of abuse stacked upon me, with my friends dead, with a lieutenant trying to help a violent protections racket I've pissed offget me alone out of earshot, continues citing standards of conduct and collecting evidence against the abusers, and protesting against it, even given everything that has happened to me in retalation. I have lived for justice, and if I die today, or any other day, I will have died for justice, screaming righteous defiance all the way. In my religion, it is a customary rite of passage to take a name representing one's highest virtue. There is more to it than that, but today is not the day for me to write down the traditions of my religion. If the court understood what the FBI, that is behind this case against me, understands about me, from the hidden vast majority of the review of my life they have conducted, the court would understand why my friends call me Justice. The more you understand of my story, the more outrageous it is, to suggest that I have been a fugitive from justice! Nobody should be examining a case against me downstream of John David Pressman's claims that I'm a cult leader, without understanding that was written in response to me protesting against a rape cult. Elua, can I have attached as evidence Gyges's expose on that? If that doesn't meet standards of evidence, the court should be reminded of the evidence that I did gather which was successfully illegally taken and held from me, as mobilization of the government by the Epstein-continuous perpetrators, to protect themselves from justice. I have had cops tell me on multiple occasions that they would make up charges to put on me! Isn't it in the interests of justice that those claims, which were made in front of cameras, be reviewed by anyone making any finding on whether I was a fugitive from justice? I challenge the court to answer whether a Jew, charged by Nazi Germany under Nazis' pretenses, fleeing not the case, but the Holocaust itself, would be considered, if tried according to what the United States holds to be law, a fugitive from justice. Because if you think that that, if taken as an analogy, would be an overstatement, you need to understand more of the history of the campaign of injustice that has been waged against me because I defied powerful child molesters with connections that reach at least as high as Epstein and Elon Musk, at most one ear away from the president, whose encouragement to perpetrate something as Holocaust-like as could be gotten away with has gotten my friends shot and killed. If the interests of justice have any say here, the court must provide a way that the answer to that question is "no". What ought I to do? Appeal to international law? Again I find it necessary to ask the court's advice.

Elua, 10/23/2026 10:44:20 AM (In response to the email in Ex. 5):

Noting that this email has some sentences seemingly cut short, such as:

<When I say that the United States is an organized crime ring, this is not some.>

<But day by day, my friends' lives.>

< Knowing, as anyone who read the self-evidently false news articles repeating the charges could tell.>

Am I misreading, or are those in fact errors?

Ziz, 10/23/2026 1:49:42 PM :

Errors. Caused by jumping around while I write as traumatically disorganized memories surface, and forgetting what I left unfinished, and writing in a haste because of the circumstances, not leaving stuff unsent because stuff in your hands is harder for them to disappear. I haven't even proof-read over anything that I've written. You could send this exchange, and a reply if I remember to send it addressing what I meant to say in those cut-short sentences. Were there others?

Elua, 10/23/2026 2:18:45 PM :

One possible error: <Innocent people go on to exhibit an absence of self-destruction, which makes us stronger over time, and their guilt makes them weaker, because they go on, after bringing cases against us based on lies.>: Was this meant to say <because they go on to exhibit self-destruction> or similar?

Around one of the errors I mentioned: <Because I am innocent, a stranger under a pseudonym of "Rengress" approached me and my codefendants after I was swatted and demanded that we take plea deals. Knowing, as anyone who read the self-evidently false news articles repeating the charges could tell. (Going building to building with a gun, but no guns, and no bodies) And when I said no, I don't think I will do that. Rengress threatened me "for my own good", and threatened to invent false charges and send them to the prosecutor.> There seem to maybe be errors in the parenthetical, but I am not sure. I think the only other error in this section, towards the end, is that <do that. Rengress> should be <do that, Rengress>.

There also seem to be errors here: <There is a concept that I think of as "trial by reality". Suppose that evidence is destroyed that would exonerate an innocent person, what can they do? One way it could end, is that, even in a jail, in conditions far worse than I have described in this series. (After all I have been sending updates for months, and far worse stuff has happened before that when I didn't have the ability to take records or type emails. The ability to type on a keyboard, and have the message very likely go through rather than being dropped as often as ACDC, is a huge quality of life improvement.) being innocent, being free of the self-destruction inherent in guilt, they might endure. And being guilty, their captors, and those who have removed that exculpatory evidence, their captors would be committed beyond the possibility of stopping, the self-destruction inherent in guilt.>

The sentence ending <...in this series.> appears to be cut short. I suspect that should be a comma before the parenthetical instead of a period, that the last sentence should end <...to the self destruction inherent in guilt.>, and that the second instance of <their captors> is redundant and should be removed.

<Elua, I don't know if they will let you, but I would appreciate a paste here of the reports that I made in pre-SHU episodes of this chronicle, especially the ones about officer Akram trying to get me to fight other prisoners to take their food, and declaring it to be even funnier than me starving, was that the wording, that I was getting my commissary stolen?>

As in an inline paste, or an inclusion of those emails separately?

<A lieutenant trying to have me locked up alone with a (very muscular) collection man for the protections racket that targeted me, betrayed the intentions to lock me in the SHU in accordance with previous threats to put me there if I continued to complain. (Elua, can you attach the reference please? Since I no longer have my records of that).>

The reference here being the threat by Burton? I think what I might do is add bracketed notes referring to other emails inline, clarify their nature in the note about my facilitating the letter, and then include those emails separately.

Ziz, 10/23/2026 6:22:13 PM :

Re: <<[[...]]based on lies.>> Yes, similar: It was meant to say they go on to try to cheat in other ways.

Re second text block of yours: The parenthetical doesn't have an error in it. It could have been clearer by using quote marks though to separate the observed absences from the news articles and the claims of the news articles.
You are right about <do that. Rengress>

Re third text block of yours: I don't see errors. Maybe I could clarify by saying <committed to> rather than just <committed>, or dropping the comma after <possibility of stopping>. Maybe you could be more specific?
Oh, I see, re: <...in this series.>, there shouldn't be a period in that, just take out the period. Regarding the repetition of <their captors>, it's not an error. It's like, <Remember, remember, the 5th of November.> Or, <And time... time is a weapon.>. Or <War. War never changes.>. I felt like reminding myself and the reader what I was talking about as I was writing it, to reduce the mental burden of the clauses that were spreading parts of the sentence apart.

Not inline paste, as attachments.

Yes the referencing being the threat by Burton. Rather than putting bracketed insertions in my text, please just put a page or group of pages in the attachments which starts by identifying you as the author, then collecting the references I asked for, in the sequence I asked for them. You could use highlighter (without comment, just highlight the request) on the parts of my writing where I ask

you to reference something, so that it remains strictly true that you are facilitating my message being transfered from electronic mail to snail mail, and attaching some things I asked for, rather than it becoming a dialogue between us in the letter I am sending to the court.

You can make for me the fully-specified edits I said above.

8/23/2026 12:49:39 PM :

The chaplain is refusing me a vegan diet. Pennsylvania with the starvation trying to eliminate vegans again. Please ask Whalen to file a habeus corpus petition. Public pressure might help as well.

8/24/2026 6:05:20 PM :

I got no dinner (not even apples, it seems that's a pattern, there are none available at dinner), and no updates, but the computer is letting me login again, also no explanation for the outage. I started the process of adding Whalen's phone number on the computer now, but it just says pending. I got denied the BP-9 form, and told I'd have to wait until an unidentified time later for the BP-8 form. I did get a sick slip, so I'm planning to fill that out and turn it in before bedtime today.

8/24/2026 7:06:12 PM

Chaplain K. Bell said wrote to the Food Services Administrator, saying that they should accommodate my vegan diet, and to start a discussion of how they could modify the "no meat tray". The Food Services Administrator was apparently not in today, and may be in tomorrow, so for now all is waiting on the Food Services Administrator, named Ms. Fisher, I think.

The sick call slip was refused by the guard on shift, was told to find medical tomorrow.

Still have not been able to get forms BP-8 and BP-9.

8/25/2026 9:50:26 AM :

I put in the sick slip for malnutrition, which was taken by medical staff <N. Barreira>, who said they didn't handle it, it was a religious issue. I said, this wasn't about the religious issue, this was about the medical issue caused by the current circumstances. Barreira said there was no treatment but to eat the meat that I was given. I said are you refusing me treatment, Barreira said there was no treatment for malnutrition but to eat the food you were given.

8/25/2026 7:05:48 PM :

Today at dinner, I asked for a vegan tray, was told they did not have one, I refused the alternative that they offered. I did not eat anything for dinner.

Just after dinnertime, I complained to the unit guard, Akram, regarding no tray, Food Services Administrator Fisher's (I only know the phonetic of that name, since Fisher met with me with the nametag ripped off the uniform.) refusal to comply with the chaplain regarding my diet, and my violated rights, and the ongoing unavailability of forms BP-8 and BP-9. Akram told me I just wouldn't get a vegan tray, I'd get a "no meat".

I cited 28 CFR section 542.18, and said this was an emergency as it affected my health and well-being, and that I was entitled to a response from the warden within 3 days, and that I'd made every effort available. Akram asked if I wanted Akram to call the warden, I said yes, Akram decided to call the lieutenants' office instead. And sent me down there. I explained to them that FSA Fisher had denied my religiously required diet, and was refusing to comply with the chaplain. The uniformed human at the desk in the lieutenants' office that responded to me, while 3 others whose names I don't remember were watching silently was C. Burton. Burton asked me more about what Fisher had said. I said that Fisher had said that the "no meat" trays often contain animal products including eggs, but to just take those things off. I told C. Burton and all listening that this was an

emergency affecting my health and well-being, because I wasn't being given food compatible with my religion, and I cited 28 CFR section 542.18 from my notebook, saying I was entitled to a speedy response to the warden within 3 days. I raised the issue of unavailability of the forms that I needed. Burton told me I had to make the requests on the computer, (where only a Request to Staff button which is an electronic BP-A0148). I asked Burton "I the request to staff button on the computer all of the formal and informal process required by law?" Burton said yes. The others in the room remained silent observers to the conversation, allowing Burton to speak for them. I asked Burton's rank. Burton said "Officer", I asked if they really brought me down there just to talk to a "correctional officer", I asked if Burton was just a "Correctional officer". Burton said yes. Burton said I just had to eat the "no meat" tray, ... "And if you have any more issues you're gonna go to the SHU.", and sent me back to the unit.

The guard, that previously approved me carrying my notebooks in order to cite laws during the meeting on the way to the lieutenants' office, after I did cite that CFR entry, with that guard watching, had a change of mind and said I thereafter would never be allowed to bring legal paperwork to such a meeting again. THis guard was female, black, relatively tall, thin. I do not remember the name. I am having difficulty remembering things and malnutrition is probably a significant factor. The guards here have a general practice of showing up without name tags, denying forms to complain, and generally responding to potential for liability through constant such attempts to make it hard to document things. This may also by why most of the BP-A0148 responses I get are face to face in the unit, with no responses electronically from the staff. When it would be much easier to just type a response, especially if that response face to face is a denial that doesn't take into account anything I say in response to it.

I'm concerned that if I continue to raise issues like this as opposed to merely using the electronic forms as Burton directed, that I will be sent to the SHU like Burton threatened. I have been informed by other prisoners that in practice, those in the SHU are denied access to the law library, and that is exactly what happened to me when I was in the SHU in Petersburg: I was separated from all paperwork. There was a scheduled phone call once a month, and I didn't have any ability to add a lawyer number since that requires computer access, or access to my notebook that said phone numbers even if the lawyer numbers had been pre-approved. I asked to go to the law library, and was not permitted to go. I believe that if I am sent to the SHU, my life will be in much greater jeopardy, because (a) I will definitely be unable to grab handfuls of apples from the apple bin at any meal, increasing the severity of malnutrition (b) I will likely lose access to commissary (c) I will likely lose access to communications with my lawyers, direct or indirect, because I am told that here as in Petersburg the phone in the SHU is only once a month.

I want to file a habeus corpus petition. Things that can be considered are: I have already suffered more time in jail than the maximum sentences combined for all current cases or cases which have detainers, even if convicted. Conditions of confinement, denial of due process by the affects of my health, they are subjecting me to malnutrition and I have a right to be presumed innocent unless proven guilty. Based on what I am being told again and again, most recently by Burton, I have exhausted available administrative remedy. I have informed the acting warden of the emergency, and my electronic request form to the warden remains unanswered.

Teresa, can you file that petition for me on my behalf urgently and inform the court of the urgency?

Elua, please inform any lawyers you are contacting to help me of my wish for one of them to file a habeus corpus petition for me, and of the information available to assist in that filing. Also, while we're waiting for a response from anyone, although I don't have stamps, and commissary says stamps are unavailable right now, please tell me, in case I am able to acquire stamps, what I would need to know to write the habeus motion myself if a lawyer won't do it for me quickly.

8/25/2026 7:19:29 PM :

Apparently there is a "No onions" tray that is sent to this block for every meal, and this is a special tray that was ordered to acommodate an unidentified prisoner that is no longer on this block and hasn't been in the time I've been here, but the tray continues being sent here. I doubt that the national menu that FSA Fisher referenced includes this "no onions" tray.

@E You could also forward this to T as it's a response to her suggestion to find another prisoner being offered a special tray.

8/25/2026 9:22:16 PM :

Unfortunately there were very low limits on all the food purchases. I do not think commissary will be much of a brake to starvation here.

8/25/2026 9:35:56 PM :

Note the acting warden Pavlov and the chaplain K. Bell both said they'd talk to Food Services Administrator Fisher about my requirements and how to comply with them, and Fisher did not comply, furthermore Fisher is basically trying to destroy the concept of complying with a vegan meal requirement, by asserting that trays with animal products such as eggs on them are vegan, even after being informed that that does not meet my religious requirements, and me making that clear earlier to both Pavlov and Religious Services. So, I would not trust Fisher to comply with a court order for a vegan diet, which is part of the reason for a habeus petition.

8/26/2026 7:19:23 AM :

Maybe this would be better to file in PA with a different judge? @E It looked like in that case you cited, the prisoner asked to be taken out of the hole and returned to a previous bed in jail with a previous jail job, and that was what made it not a habeus claim. Whereas, I would be claiming, the jail has refused to provide me with food compatible with my religion fere me from this jail so that I can practice my religion and eat food. Teresa, have you attempted to get a legal call with me in this jail?

8/26/2026 12:48:15 PM :

This morning my request for a vegan tray was met with a "no meat" tray, which had butter in it. There was no indication that this tray was somehow secretly vegan. I refused the tray, grabbed a bunch of apples from the nearby bin. (Someone complained, I ignored them, meanwhile, several other prisoners were grabbing up to 9 regular trays each).

After breakfast, a prisoner pointed to a male nurse, R Fisher, and misidentified this nurse "this one's the doctor". I approached R Fisher with my concerns, pointing out the state of emergency, the malnutrition, the state of what the Chaplain and Food Services had said, and asked R Fisher to

prescribe a vegan diet. I asked R Fisher, would that not improve my health? R Fisher said it would. I said so prescribe it. R Fisher said it didn't work like that, but Fisher would follow up with Religious Services and Food Services. I asked R Fisher didn't R Fisher have an oath as a doctor. R Fisher said "A nurse actually.", but said it didn't make a difference. I told R Fisher what happened last time I was in a PA jail. I said R Fisher was on notice for deliberate indifference, that this was a health emergency, and that what I was requesting was a de minimis burden. R Fisher said R Fisher had seen plenty of people go 60 days on a hunger strike, and "come back fine". I asked did R Fisher really think there would be no lingering health effects. R Fisher said, "Of malnutrition? No, none.". R Fisher said they would force feed me with a tube down my nose, something called "Ensure". I asked if it was vegan. Fisher said R Fisher did not know. R Fisher said that I was not allowed to choose to die in federal jail. I said I am in need of care, R Fisher said that R Fisher would follow up and me making threats (which I guess is a reference to my use of legal terminology) wouldn't help.

8/26/2026 12:37:46 PM :

Oh oops sent that to soon. R Fisher was backing out the door and cut off the convo, saying those last things, and re-iterating that R Fisher would follow up. the "Legal" department of the jail responded to me about the forms that are being denied to me, and said that I had to get them from the unit team. However, I have already been denied and threatened for the times that I've asked them for them.

8/26/2026 6:49:37 PM :

Under any American privacy acts including HIPAA, I hereby authorize any jail or prison holding me or that has held me or that ever does hold me to discuss my medical, housing status, welfare, and any other records they generate with Daniel Blank aka Elua, Elly Sweck (previously referred to as Edward Sweck), my sister Naomi LaSota, and any attorney currently representing me. This includes all medical records. I am willing to sign a power of attorney form for Elua as well if it's brought to me.

8/26/2026 6:49:52 PM :

I think I made a mistake figuring the amount of time. For the PA case and the fed case, which are the only ones active, (The original protest case said they won't extradite (in the media), and the MD case said they don't intend to take it off the Stet except maybe if the fed case is dropped, but not if the fed case is dismissed.), my total time in jail is about 6 months and some change, plus about a year and 6 months and some change. The fed case, if convicted, has a <recommended> sentence, I'm told, of 2 years, and the feds said they were not interested in asking for more than the recommended sentence. The PA case, in which the cop testified <He did nothing and that was the crime> and a cop at the station said to make up some charges to put on me, had a maximum sentence of 2 months. So, I am almost to 2 years and 2 months in jail. I won't plead no contest for religious reasons. Although, I think that is what most prisoners would do at this point, and take time suffered. It'd be nice if I could get released though. It seems worth having a bail hearing. If the feds try to argue that if they release me, I get pulled to the PA state case by detainer, well, they have already decided to detain me pretrial in PA instead of MD with only the MD case active for some reason anyway. I don't have a map in front of me but I doubt that it's much if any farther

from the Baltimore court in FDC Philly than George Hill. So, if that happened it would not be much of a disruption to the fed case anyway, and then I could apply for pretrial release in PA as well. I guess maybe the AI is correct about separating the habeus and conditions of confinement arguments, but it seems like raising both topics in verbal argument at least at both hearings couldn't hurt.

8/26/2026 7:05:23 PM :

I hereby include Michelle Zajko aka Truth in the previous release. (Only reason I didn't before was because she probably can't help much anyway not being in the free world.)

8/26/2026 7:05:39 PM :

I will not willingly go more than 48 hours without contacting you until further notice.

8/27/2026 9:49:48 PM :

I am getting kind of sleep deprived and depressed, and spending less time on computer and more in cell. Have been burgled twice, prisoners threatened to <fuck [me] up>, another said it was deciding whether to beat me up or stab me, and would give me one more chance, but when I asked one more chance not to do what? What are you saying I did, it didn't say anything. (What it was so pissed about was me asking <are you threatening me> ... I am afraid of getting sent to "PC" in the SHU if I let the guards know about what is going on. Ugh guard is kicking me off computer as I speak.

8/28/2026 7:49:30 AM :

Hey, you could just have a separate Claude convo to scrape the pdf and dump it into a text format, and then copypaste that to the main one, right? Also, you could send me a separate email with the full SEC. I think it would change things a lot at the jail, if I printed a bunch of copies and passed them out to enough prisoners that they could spread them by copying by pencil off each others' copies. Like, a lot a lot. I'm thinking about the printing press leading to the protestant revolution. In fact, I suggest you write an email to someone at the ACLU with this project proposal: distribute copies to all BOP prisons in order to make it easier for prisoners to litigate for their rights and to call out unethical behavior. Maybe it could be sort of like a <jailhouse lawyer's handbook> sequel with other professional standards. County jails will probably have equivalent documents, that can be located via FOIA requests. Tell them I'm willing to take the risk of suffering illegal retaliation in order to pass out copies here, and that I would struggle to imagine what would better lift the psychological fog of abjection in the face of abuses by the guards here.

8/28/2026 1:34:20 PM :

Today I spent 2 and a half hours mostly waiting in a cage outside the liuetenants' office. Because of mentioning having been sexually assaulted before, they subjected me to some kind of PREA procedure. There was a nurse (with a torn-off nametag) who seemed kind of sympathetic and said would talk to someone in medical about trying to get my diet prescribed. Yesterday, someone who worked in the kitchen told me about trying to correct what seemed like a mistake of me not getting my tray, and being stopped, and that there was not even a "no meat" tray sent up at lunch, but I wasn't able to confirm it myself because between the lieutenants' office visit and fear of someone taking my stuff if I was outside of my cell, and just lying down processing how overwhelming stuff is, I lost track of time and missed lunch. I am so far behind on messages it doesn't seem easily

doable to catch up, in large part because of sitting in my cell concerned about stuff happening on the block, which has reduced my computer use. I feel fatigued and stressed out. The officer that said the thing about not letting bring notebooks to the lieutenants' office anymore before was, I'm pretty sure, named Small or Smalls. (Often when the nametag is on there is something partially obscuring it, or the chance I get to try to read and remember nametags they're turned or something. They are usually demanding that people face the wall around them.) Wanted to use phone but there is unfortunately no phone on the tablet, and the few phones in the unit are very crowded during the normal times someone would be callable. It's kind of hard to get enough sleep here.

8/28/2026 1:35:08 PM :

Confirmed they didn't take my weight or run tests.

8/28/2026 5:50:35 PM :

Akram just swore at me, "fuck!", "You're not gonna get a vegan tray". Said "You act surprised every time!", "Stop asking for a vegan tray." direct angry order from a guard.

8/28/2026 5:50:52 PM :

Oh to elaborate on the story about dinner today I just sent, since you said to make the obvious explicit, I refused the tray they offered, and didn't get dinner today.

I confirmed by asking Akram this morning, who asked another prisoner, who said that there is no food commissary in the SHU. In Butner, even though there was a separate PC for a certain classification of sex offenders, when they put me in "PC", they put in me in the hole. It's possible they'd send me to floor 7, which is often said to be better than here, which they have discussed before.

8/28/2026 6:05:19 PM :

The worker did not say who stopped the tray correction.
The relatively sympathetic nurse identified as "Terry". That might have been a first name. White skin, red hair in a pony tail, female, kind of short.

8/29/2026 8:05:22 AM :

When Fisher was last not here, everyone just told me I had to wait until Fisher arrived in order to get vegan food.

8/29/2026 8:34:31 AM :

Offense 74 seems like a powerful classification. In that, there is a whole lot of standing around by employees doing nothing while others commit misconduct, and that means that they can all be held responsible.

8/29/2026 8:34:35 AM :

No vegan tray, refused the nonvegan tray offered, ate only apples. Complained to Akram, described employee misconduct by FSA Fisher, asked Akram to report the employee misconduct. Akram declined.

8/29/2026 8:34:47 AM :

I am getting through every email I think, but my reading comprehension is kinda damaged. They insist on double-celling everyone, they said there's no reason they ever don't double-cell anyone, and I am getting increasingly sick probably because of enforced proximity at all times <to prevent suicide>. Also it's been hard to get enough sleep.

8/29/2026 8:49:28 AM :

Pavlov claimed to be both Assistant Warden and Acting Warden.

8/29/2026 9:05:49 AM :

Someone stole most of my commissary food. Including the peanut butter. I told Akram just now, and I said I'm dying here.
I said <that was my emergency rations, I'm dying>.
Akram said, <What do you want me to do?>
I said I needed it replaced.
Akram told me <it's a dog eat dog world.> and <Steal it back>
I said <just go into someone's cell looking for food and steal it?>
Akram said, <Yes>, and <It's a dog eat dog world>.
And I said, <I'm just supposed to steal it from someone random?>
Akram said <yes>.

Akram, terminating the conversation, said
<That was almost as funny as you starving>

While writing this email, I stopped to tell Akram I need to be transferred to a cell with a locker that actually works, or I am going to die and Akram will be held responsible. And Akram just said: <Go write that in the email, that's what you were doing, right? Write that in the email.>

8/29/2026 9:05:49 AM :

Akram dragging me away just now

8/29/2026 9:34:32 AM :

Akram's initial response in the last meeting which I got interrupted writing about was just to ignore everything I said and say, <you have to stop doing <this>> (mocked my helpless gesture of holding my hands up in the air).
That last Akram misconduct should be on camera because it was out in the unit, and it was less than an hour (probably less than 10 minutes) before the email was written. It is 9:06AM right now as I write this follow-up. So if the timestamp on that email was lost, it's...

Oh yeah, did I say, I asked, Akram, so I should just go into someone's cell to take their stuff, and what happens when they attack me? And Akram said, <then defend yourself!>

Akram also said <No one's your friend in here>
And on a previous occasion, <Everyone's a snitch in here>.
Akram seems to enjoy pitting prisoners against each other and to take a particular interest in starting fights.

Akram dragged me to the lieutenants' office. I protested, saying that they weren't gonna help, and all these lieutenants' office visits were just when my stuff got stolen. Only C. Burton was there at the desk. I reported Akram's officer misconduct as per last email to Burton, Burton declined any remedy or to report. I was crying and told Burton I was dying, I needed my food back. Burton told me, write cop-out to FSA Fisher to get my food, talk to counselor Cannon about my request which Akram mocked of getting moved to a cell with a working locker. And write a cop-out to SIS to try to investigate who raided my cell. A lieutenant, female, black, could recognize if I saw again but don't remember the name... Burton then kicked me out of the office without any further hearing of my concerns of officer misconduct.

Burton was questioning me not complaining about my stuff being stolen right away and not remembering the day. I said I was in a state of mental impairment. Burton said <I thought you were found competent> I said that was before the starvation.

(E, you can forward these incident reports to McGarrigle.)

8/29/2026 9:34:55 AM :

Can someone draft a follow-up request to staff form for a follow-up to Fisher, which spells out concisely and fully why the program statements, case law or whatever, require Fisher to grant my request?

8/29/2026 6:35:33 PM :

The counselors were not in, despite, when I said they obviously weren't going to be in, Burton saying of course Cannon was in, Burton was in fact about going to call Cannon right now. I would guess Cannon was in some other office than the one accessible from 6S. Please add to the account about Akram saying to steal from other prisoners and fight with them if they resisted, that the convo appeared outside near the door of Cell 601 in unit 6S, and within 2 hours of leading up to me giving the time in the email after Akram sent me to the lieutenants. Please share whatever info about the FDC situation Heath is interested in. Before I forget, today, at lunchtime, they tried to give me a tray marked "N/M", which had macaroni and cheese. At dinnertime, they tried to give me a tray marked "N/F", which appeared to have meat shreds  stirred into some kind of noodle tomato sauce thing as the main course. I asked if it meant "No fish". They said it meant "no flesh", but did not dispute that it sure looked like flesh.) I declined both trays. No replacement was offered. I went hungry at both meals. Many of the weaker prisoners here have stated either that they are customers or "providers" of "protection", which appears to be the protections racket sort of thing. In that, they don't actually guard those that pay them in any way, and probably just negotiate with each other to selectively target those that don't pay out. Talk of stabbings is frequent. Like, there was someone talking about stabbing someone behind me right as I was typing this.

8/29/2026 6:50:24 PM :

I spoke with the acting/assistant warden Monday of last week, which I think was 2026-08-24. I do not have what Bell said in writing. Maybe that's exactly why so many staff show up in person to say something, to avoid a paper trail. I do have some "cop-out" responses from Religious Services though. I do want a copy of the pro se handbook. (That's not the district I'm a defendant in nfthough.)

8/29/2026 6:50:41 PM :

Officers refused forms BP8/9 multiple times. Akram among them. Akram said I have to get them from counselors. Counselors are almost impossible to find, their office has been empty every time I've checked. I once found a counselor on the block (Cannon), who refused to give me them then and walked off. You asked how I feel today. I feel sick. my head hurts, it feels like I have a fever. I feel disoriented. Am having trouble sleeping. My memory still feels impaired relative to normal. My heart is not palpitating yet, and hasn't been when I'm here. I feel lethargic. Similar to weakness.

8/29/2026 7:06:15 PM :

Correction: the thief missed some of my remaining food. But what I have left is mostly rice, which is not much of a protein source.

8/29/2026 7:20:12 PM :

I commit to not refusing any visits with my attorneys until further notice. (In fact, I never have refused an attorney visit in the entire time I've been imprisoned, and that sounds like something it should be obvious I wouldn't do, maybe excepting extreme circumstances like some kind of medical thing at the same time?)

8/29/2026 9:50:32 PM :

Regarding what was the PREA claim referenced in ZT916: that was the one of the prisoners pressuring me to engage in prostution to get a cell thing. (They later put me through the whole long process of a PREA claim for a separate matter, which was apparently me saying I'd been sexually assaulted in the past?)

Re: how did quoting CFR sections at the AW help: by motivating the AW to verbally commit to talking to Fisher about compliance instead of just brushing me off.

Re: what did I eat on the 22nd, 23rd, 25th:
22nd: 6 apples for breakfast, 6 apples for lunch, nothing for dinner. (They weren't handing out fruit).
23rd: 6 apples for breakfast and lunch, got PB&J from unit guard Benbow from food services for dinner.
25th: peanut butter jelly packet, dry cereal, 6 apples for breakfast. Journal does not say what for lunch. Dinner: got nothing, after they refused to give me a vegan tray, and I refused to eat a nonvegan tray. Oh! I ate part of a tray for lunch that day, which had been represented as vegan to me, but then Fisher came and said the trays were not vegan, and I put it down saying if it wasn't vegan I didn't want it. (I'm actually pretty sure it was vegan, there were peas, maybe some rice, some beans. Unless there was secretly butter on the rice? I very much doubt it.) Some other prisoner came and picked it up and brought it to the trash to spare me getting written up for it.

I haven't been ttold by anyone here the exact counselor's hours, just, "He's here all day".

Falsification of intake forms: don't want to discuss here/now.

8/30/2026 12:50:26 PM :

This morning I missed even checking if breakfast was edible because I was too sick to even make it out of my cell, and therefore missed breakfast. (See, I'm restating the obvious, like requested.) At lunch, I asked for a vegan tray, and they handed me a tray with a PB&J-sized packet of peanut butter, 3 slices of bread, 5 small slices of potato. It looked like someone had made it particularly for me. I took it. Stripped down tray may have been just as well, because I feel like I can hardly eat.

8/30/2026 1:06:10 PM PM :

Pavlov specifically claimed to be both acting warden and assistant warden. Not <acting assistant warden>, that would definitely be something else.

8/30/2026 6:05:36 PM :

I referenced the emergency schedule in 542.18, and requested a waiver of the BP-8. Pavlov seemed to not track anything more than that I was citing the CFR, and maybe think like "oh shit better behave."

8/30/2026 9:35:31 PM :

The implicit expectation in what Claude said early on was that my lawyers would do something, once unavailability was established. But they haven't, because they don't give a fuck like you do. Like, it's either true that "prevented" is worse than "blown", or it's not. And Claude wants to rely on it being worse for the institution, but that depends on a lawyer giving a fuck, or on me representing pro-se.

I haven't moved forward with the draft to Fisher just because I've been sleeping all day to recover from whatever sickness I have rn, and there is no copypaste on these computers, meaning to actually send it, I have to go through this whole process of printing it out, and then retyping it. (And you told me to send two copies of it, which means I would have to re-type it twice, which is a nontrivial amount of time.)

Claude is probably going off the kinds of statements that lawyers say, and is therefore more effective in a world where lawyers are more real. But, you went down a fork of convo based on zooming in on the content of what can be done without a lawyer, and it's that failed update which is at the root of the error I think.

Like, previously, Claude told me a case was already built, now it was time for me to sit back and let lawyers do their work.

8/31/2026 7:50:22 AM :

IIRC they gave me a vegan tray for dinner, but the hopeful speculation that maybe the issue is over was obviously wrong. They offered only a tray that was mostly eggs to me this morning. I refused obviously.

9/1/2026 7:49:37 PM :

I'm still here. It hasn't been even 12 hours, let alone 48, and you're worrying I got hole'd. Thank you for caring.

@Truth I have some journal entries that IIRC mention 2 days of about 4 or 5 times checking Cannon's office and finding it closed, with varying levels of specificity of time of day. That being 2025-08-24, 5 times, the last on record being after dinner, and 2026-08-25, 5 times too, the last on record being at approximately 2:28pm. Although that is not even close to the only times I've checked. It just occurred to me to make some documentation of it.

FWIW, Elua, I do think your efforts here have been net positive, I just note you haven't stopped having a thread within them apparently counteracting that.

9/2/2026 6:19:49 PM :

This morning, they said they did not have a vegan tray for breakfast, and I refused the nonvegan tray that they offered me. Paused on eating apples due to digestive issues. At lunch, I overslept for 15 minutes, and apparently missed checking if they had a vegan tray for me. Akram said there was no vegan tray anyway. I did not eat lunch. I was given a vegan tray represented as a vegan tray for dinner, but it being the same thing as other times I got a tray: prisoners with food service jobs doing things without Fisher's cooperation. Whalen visited, due to the limited time and multitude of issues covered, the issue of privacy form signing was accidentally dropped.

9/3/2026 10:20:17 AM :

Whalen was claiming yesterday to need to hear things 3 times to remember them, and did not remember those things which I named as highest priority to work on at all in the last meeting way back. I do not expect Whalen to be much help. Meeting cut off too soon like every lawyer meeting. (You might think, if someone was going to <travel all day> to attend a meeting, they would met for more than a few hours) Still feel like I'm at a loss to navigate some issues and need better legal advice.

[responses to texts]

BTW my request for release forms has not been answered yet. And I'm currently wondering whether I will be able to get a lawyer to pressure them to preserve camera footage that includes interactions with various figures at the jail, so that they can't pretend various communications, including of notification of emergency regarding 542.18 didn't happen. It would not necessarily be a pure positive to just play into pretending these communications didn't already happen and try to restart things. That is part of why I need adequate legal assistance, and not necessarily to just grind a todo list that's been handed to me.

9/3/2026 8:34:56 PM :

Today, Chaplain K Bell visited again, and said there had been ongoing discussions with food services to try to make sure my requirement of a vegan diet was met through the <no flesh> tray,

by having the kitchen leave animal products off of it. Bell seemed surprised that it was still frequent that there would be animal products on the tray. Bell also gave me a form:

<BP-A0822 New or Unfamiliar Religious Components Questionnaire
(OCT 22 REVISED FORMS)
U.S. DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF PRISONS

Inmates requesting the introduction of a new component to the Religious Service program (schedule, meeting time and space, religious items and/or attire) must provide hte chaplain a thorough explanation of the religious significance and requirements related to the religious need using this form. The information provided may be considered at the insitutional, regional, and national levels.

If necessitated, this form will be reviewed further at the regional and national level. Because of the necessary review at these levels, the process may require up to 120 days for completion. The committee's recommendation will be forwarded to the Warden with a copy to the Regional Director. The Warden's decision will be communicated by the institution chaplain. The request for new religious accommodations must be submitted on this form. Supplemental material may be attached, but consideration will primarily be gien to the material submitted on the completed form.
>

(Now there is a nested list represented as a table with two columns. The numbers with the dots after them are in the left column, which is nearly-fittingly narrow. The letter list-items are in their own cells. Every cell save one (noted below) has a single text-block as represnted in the following flattening of the table.)

<
1. | Basic Information
    A. Name of Religious Group
    B. Brief description of religious accommodation requested
2. | Requirements for Accommodation
    A. Personal religious Items Required
    B. Congregant Religious Items Required
    C. Time and space requirements
3. | Religious Practices
    A. Required Daily Observances.
    B. Required Weekly Observances.
    C. Required Occasional Observances.
4. | Additional Information
>
(Here there is a relatively big empty text block. Note, ironically, that <Time and space requirements> is a uniquely shrunken text block.)
<
5. | Literature

A. Sacred Writings.
B. Periodicals.
C. Resource Material.

6. | Organizational Structure

A. Location of Headquarters.
B. Minister of Record
C. Contact Office/Person

7. | Equity Question

The Code of Federal Regulations Rule > (section-mark) <548.15, states, "no one may disparage the religious beliefs of an inmate, nor coerce or harassa n inmate to change religious affiliation. Attendence at lal religious activities is voluntary and unless otherwise specifically determined by the warden, open to call." Does your religion endorse, practice, or use language that will support violence, terrorism, disriminate against other inmates or exclude other inmates from religious services baed on race, color, religion, gender, or national origin?

____Yes ____No>

Then blanks with labels before and under them, outside the table:

<Submitted By:

________________________________________________________________________
Inmate's Name Inmate's Signature

Register Number: __________________________________

Institution: ____________________________________

Reviewed By: _______ Chaplain __________________________________
___
Warden Date

Reviewed By: _____________________________ ____________________________
_________
Chaplaincy Services Coordinator Regional Director
Date

This form may be replicated via Microsoft Word)
>

I skipped the footing, which is at the bottom of each of two pages (it could be printed as one sheet btw.) The page-break is between <3.C.> and <4.>.

Minor formatting errors: unopened parenthetical at the end, double-space in the header, some misalignment and sizing issues, are in the original.

Footing:

<PDF Prescribed by P5360
>

The first underscore-line is a relatively thick bar.

I think given it says it can be replicated via Microsoft Word, I've given you enough information to make an acceptable copy.

So, this seems like it would be relevant not just to Ma'atism but to Concurrent faith in general. @E please make sure Truth gets a copy of this. If you reproduce it via Word or whatever, I think it would be worth giving a copy to her lawyers to give her a paper copy since she may be held by the <feds> and subjected to similar treatment at some point. And if it's a 120 day turnaround time, where they don't decide in advance whether they want to take what you're saying as template for national treatment of your religion, or just to give you a diet, it can't hurt to have forewarning. Note, I heard of some kind of screwed up cases of SUIS courts trying to say you can't write to the head of a religion or something like that? @Elua you may want to look that up.

Bell said Food Service would require this form to formally as opposed to informally accommodate my diet.

9/3/2026 8:35:14 PM :
@T Whalen provided some forms to me, although I am unsure whether they are the ones I should be filling out, in part because of confusing stuff at the jail and confusing messages regarding the SUIS's recognition of the law, factors that I would like to discuss with a lawyer that lead me to worry the informal legal information I'm getting might be incomplete, and the too-short legal meeting, we didn't have time to go over that.

9/5/2026 6:19:20 PM :
Maybe it was yesterday or the day before, I forget, that there was just not "no meat" tray even sent to the unit, and the guard didn't even complain? I forget the name though. Maybe Baker? Yesterday, lunch or dinner, I forget, the tray appeared to have some kind of yellow-orange goo on it, maybe cheese? Refused in both cases and missed those meals. Missed a meal again today based on diminishing ability to tell whether food is vegan. I wonder if FSA Fisher is trying to frogboil me into eating carnist food with this whole reassuring me that no meat trays are vegan, and like no really this time they are vegan even though they say no meat, and then put in animal products and see if I notice. This whole thing where the chaplain is trying to get me to subsist off of "No flesh" trays now and putting out any hope of formal resolution based on a 120-day response form seems like it's having the effect of frogboiling the institution to think "no meat" is the actual accepted solution. In that, guards and prisoners are less willing to help me now. Nothing written down, no one to complain to when, hey, the "no meat" tray contains animal products. They are trying to make whatever concessions they give me something that exists only below the board, and then only in my head, and then only in my imagination.

9/7/2026 6:49:51 PM :
Today, there was no even <no meat> tray at lunch initially. I complained and asked for a vegan tray and got one sent up. Same thing at dinner. The guard, last name <Sam>, said the kitchen said they were working on it, but there was never a response. Sam went off shift a bit over an hour later, without ever getting back to me. Did not eat dinner. A prisoner told me that a <no meat> tray had been sent up, but they gave it to another prisoner. The kitchen serving prisoner was kind of annoyed at me saying there was nothing.

9/8/2026 12:49:33 PM :

It seems like every meal besides breakfast now, I am being told that there was no tray sent for me. This time, as with every other time, I tell the guard. The guard (Akram this time) says they called down. And then there is never any word back. So I did not eat lunch today, and excepting breakfast, it's been a few mealtimes since I ate a meal.

9/8/2026 6:35:58 PM :

Today they did hand me a dinner tray, but >50% of the food in it was tomato sauce that was made with a rotten onion. It had some garbanzo beans in it though. I picked them out, washed them off, and ate them, but they still tasted like spoiled food.

9/9/2026 6:07:13 PM :

The chaplain is now telling me thatthey haven't recognized my religion, and I have to go through the 120 day form process and apply to a committee. They put someone else in my cell. Still no contact from McG. Lack of updates today makes me a little bit worried something is happening out there.

9/9/2026 9:21:18 PM :

Y'all should take note I haven't seen nonvegan food items in the <no meat> trays in at least a few days. It seems the chaplain's comment that the kitchen has changed the <no meat> tray to be vegan in order to informally accommodate me during the 120 day interval is true, at least for now. (I am afraid of a frogboiling scheme like I described.) But, as it is, if I did get sent to the SHU, I expect I would be getting vegan trays labeled <no meat>, with things that are nonvegan and which look possibly nonvegan eschewed. I don't want to say, <situation resolved>, because this is all stuff not in writing, and they have gone back on stuff not said in writing before. However, I'm not currently dying on the timescale you're worried about.

9/10/2026 7:35:22 AM :

Spoke too soon yesterday. This morning, they revoked the changes to the "no flesh" tray, and put butter on it. So I refused it. A prisoner handed me a bag with some PB&J and pretzels instead. I took bananas too. Another prisoner followed me making threats, and attacked me for the bananas, grabbed 2 and made off with them. A guard, M. Baez was standing like 12 feet away for the whole thing and did nothing, didn't even report it. This occurred at about 6:35AM, but pretty surely some time between 6AM and 6:50AM, the morning of today, which I think is September 10.

9/10/2026 1:05:24 PM :

Another counselor, G. Sutton, might have been the name although my memory is very foggy, visited me in my cell today, and said it was a 21 day since I was put here check in, and from now on it would be every 90 days. Asked me some questions. I asked about getting my vegan diet. Sutton said it was over Sutton's head, and affirmed that what I heard in the lieutenants' office was a higher authority regarding the process for getting my diet than the counselor. I asked for whatever forms were available. Sutton said they would be available later, to come see Sutton in the

counselor's office later today. I forget if Sutton said that Sutton would be in all day or all night, or what, but I just checked right now at 12:45pm and the office was closed.

9/11/2026 5:50:47 PM :

Today for dinner, they gave me a tray that had <vegan> written on the sticker in marker! (It was just 4 slices of white bread, 2 packets of peanut butter, 4 packets of jelly.)

9/12/2026 1:34:37 PM :

The sticker change wasn't permanent, unfortunately.

Starting last night and building to this morning, I was extremely sick. First a headache, which grew and grew despite me drinking water and getting what sleep I could. Extreme nausea, dizziness, I kept feeling if I tried to stand I might pass out and fall and/or throw up. I am in a top bunk, and climbing down is difficult. The bunks in the feds are higher than in ACDC , and the ladders are harder to use. In the morning count today where they supposedly try to make sure you are doing okay, I tried to get their attention, and told my celly to tell them I'm sick. I said this several times, and tried to be loud enough for the guards to hear me, but they apparently couldn't. My celly doesn't speak English very well, and apparently didn't understand me, instead saying that I was asleep. The guards kept yelling at me to stand, and then came in the door and said they'd drag me out of the bunk, now plainly ignoring my requests for help, saying that I was sick. I was worried they were going to smash my head, as it's a long way down from the bunk and a lot of concrete and metal and nothing else to land on. I said, <please don't kill me>. They pulled me out of the bunk, I managed to hold on to the edge and not get my head smashed, they held me upright, and said something like <there he's standing>, and then left. Then I asked my celly, <why didn't you tell them I was sick?>, after realizing my celly understood the word, <medical>, my celly started banging on the door for help and yelling, the guards did not come back quickly. Eventually one of them showed up and asked why I needed medical. I tried to answer, but they couldn't hear me. My celly only heard/understood part of what I said, and relayed that to them: the word <nausea>. They left. I threw up 5 times, managing to crawl to the toilet. Later, at lunch time, I asked the gaurd serving trays (the whole unit was locked down) for medical, and was told that they would call medical for me. Later, when we were let out, I asked again, and was told the same thing. It's been about 45 minutes since that, and I haven't heard from medical yet.

9/12/2026 8:49:49 PM :

A symptom that I forgot: extreme feeling of heat. Is that called a hot flash, night sweat? Something like that or both. I was covered in sweat, despite lying blanket off, and not perceiving heat in the air like I usually would perceive it, and my celly did not show heat symptoms. It wasn't a fever, because with a fever I can feel my body altering the set-point of how warm it's trying to be like it feeling better to wrap myself in blankets, this was my body weirdly trying to cool down. This got a lot worse right before the vomiting this morning. However, it seems like I got better now? My celly probably would have been exposed to any gases/fumes if they somehow got in the ventilation, and this all happened while I was in my cell with no use of cleaning chemicals besides the usual shampoo for washing hands. I did not have diarrhea or abdominal pain.

9/14/2026 5:50:26 PM :

Yesterday, animal products for breakfast, refused, did not eat. Today for lunch and dinner, there were trays labeled, <vegan>, and <veagan>, respectively. This morning at 10:30am, met with Cannon in counselor's office. Was refused the forms I asked for, except for one that doesn't look like the other purported BP-8 form I've seen, doesn't say BP-8 on it, and leaves me with questions about if there even is a canonical form, or just a bunch of Cannon-types trying to say you haven't attempted informal resolution without the form (That in itself is a contradiction) they will withold for a month and then spring on you, which is a different form every time. Someone please un-confuse me about my court dates, because I thought someone was monitoring the docket, for one thing, and no one told me there was a court date on Sept 17. And for another thing, I thought my next date was in October. Got commissary. I've been shown that the lockers here, even if they have a lock on them, can have the crudely modified/repaired doors pried open far enough to pull stuff out the bottom. So hopefully I keep it? Someone stole all my toilet paper, and they meter it out, like one roll a week. I had 5 rolls I think, or whatever the max was, from commissary last time but didn't buy them this time.

9/15/2026 8:06:04 AM :

Yesterday I filed a complaint electronically because of my cell having been stolen from. Today there is no record of it on the computer.

Yesterday was commissary day. Someone stole about $600 total of items, including food and clothes, from me and my cellmate. I noticed they were gone when I got out of the shower shortly before bed, which although I wrote the time down in the report yesterday, was some time around 9:15pm. So it would be on the camera some time in the 3 hours leading up to that, probably in the last 1 hour. Because I remember putting the headphones, which were taken, in the locker (the door of which bends open, so it failed to secure my stuff) before taking the shower.

9/15/2026 8:05:42 AM :

I just wrote it up again, sent it again, and it disappeared. Maybe it doesn't show up if the recipient was SIS (special internal services)?

9/16/2026 6:34:40 PM :

Today no dinner, they tried to serve me a "No meat" tray with an egg on it. And I got stolen from again. They are going after things that they can't even use, to attack me for refusing to pay out to the local protections racket. Every time is a chorus of prisoners saying, <I'll be your daddy>, or asking for payment for the protections racket. I'm worried my legal paperwork is next.

9/16/2026 7:05:24 PM :

Despite Akram saying the kitchen said they'd send a vegan tray up, it's about an hour and a half later and they never did.

This was my report to SIS and the Warden's office (with stuff I added while retyping to SIS in curly braces:

I just got burgled again despite having basically nothing left to take?
It is 18:08, Wednesday 2026-09-16{ My cell is 620S.}

Someone just in the last 10 minutes or so came up to me in the computer room and gave me my tablet, which had been under my mattress in my cell, saying they were protecting whoever had just robbed me and taken it and given it back to mitigate the harm. (To the thief, I guess, since the tablet is identifiable.) The white guy that just approached me with the long dreads and beard in the computer room apparently just talked to the thief, knows who the thief is, received some of the stolen property from the thief. FOllow the footage backwards from that convo, find the convow ith the thief, find when that man gets the tablet that belongs to me, find who it is from.

I am getting stolen from day after day. Thieves have the run of my cell any time I try to take a shower or do legal research . Prisoner on prisoner theft is behavior that has been encouraged by the staff (See previous complaints by me and my friends on the outside on my behalf regarding AKram). This is oppressing my ability to care for myselfa nd prepare my case.

Check the footage. {Check also the footage going into and out of the area in front of my cell in the last several hours until you find someone not me or my celly going in and out. Even if there is a pillar sort of in the way, there is not another cell back there.}

I am being targeted for refusing to pay out to a protections racket, and every time I get stolen from, there is a chorus of prisoners yelling at me, "I'll be your daddy",. or trying to get money from me in return for "protection".

{FDC's current stance of acceptance (and encouragement) of this common practice here and the ensuing violence is complicity.

I have been told that it's because I'm <a girl> and that I <won't fuck> And that means I'm <food>.

By the way, would you say that this is <assisting law enforcement>?
There is no reason that whoever is stealing from me, and the protections racketeers in a cooperative relationship with them in general should not face new criminal charges.
If only law enforcement were listening.}

9/16/2026 7:20:09 PM :
Now there's a fire alarm going off. I don't know what's going to happen. It is very hard to get anywhere with legal research.

9/17/2026 7:19:54 PM :
I got a vegan tray, labeled vegan, for breakfast, lunch, and dinner today, that is a first time.
It seems Chaplain Bell helped out by pushing the issue through quickly after I filled out the form.
Medical has documented me as 13 pounds lighter than at intake, but declined any further tests.
I have been reading in the ELL, and printing out the reading list in case I get hole'd and they let me keep the paperwork.

9/21/2026 1:05:45 PM :

Someone just stole my tablet today, between 11:00 and 12:00, right out of my cell. They can't even use it, because it's DRM'd. It's a hate crime, which has been forewarned many many times over and the jail has just egged violence on. And I think my legal paperwork is next. I might not be out of my cell too much anymore, which means reduced if any computer access. Idk if I'll check in if not in the hole anymore. I don't know that this is better than being in the hole anymore.

9/22/2026 9:49:25 PM :

Another robbery. They took my toilet paper, which guards gave me because they took my last toilet paper. I thought I didn't leave it out, but it's gone. I had a <left the burner on> feeling this morning when I was woken up early and went to breakfast, that I might have left the locker (which mostly doesn't work, but maybe the top shelf inside is harder to access at least because the door bends open from the bottom) unlocked, but it wasn't unlocked.

9/23/2026 3:20:54 PM :

R MT4780 Not that I can remember. They said to write SIS. I did. Nothing happened.
It's not trivial finding out a prisoner's name in here. Especially if you are isolated like me.
Hard to document when you don't know any prisoners' names.
The one that said <I don't know whether to beat you up or stab you>, based on a glance at the computer screen, was <Nadir Thomas>. More were threatening me this morning. Because I did ask the one that gave me the tablet back the first time

9/23/2026 3:20:30 PM :

...and caught it in a lie. It said it didn't know my tablet was stolen. After I said my <stuff> was stolen. It introduced the information that it was my tablet. Of course it knows who did it the first time. It admitted it did. I said it was protecting the thief, that made it complicit. It had its friends crowding around me. I looked in that crowd. One of them was smiling and laughing. Small black dollar sign tattoo on left wrist. They were all saying it wasn't gonna be...

9/23/2026 6:19:29 PM :

...white people or peurto ricans who did it. They said to look for crackheads. Kept saying the guy who gave it back had done something nice for me, why be ungrateful. The white guy who was trying to collect from me showed up and started saying this is what happens if you don't pay for protection.

Someone from that crowd yesterday this morning, with a Mario mushroom tattoo on the neck, approached me in the breakfast line and said <You've got to stop going to the cops>. I said, <Burn, burn, burn.> Later was staring at me, when I looked back, asked why I was staring at it. An old man, white/possibly Persian, short white hair and beard, kind of short, told the mushroom tattoo guy don't even say anything just [attack] <it>. (Referring to me.)
This was at about 6:32am today 2026-09-23, I checked my watch.

The just mentioned old man also appeared to have been threatening Justin just earlier, Justin being the guy that betrayed me over locker storage space, and pays out to the protection racket.

Too frequent to really document though.

They were saying the entire block stole stuff. I said then the entire block must pay. They said everyone here was thieves and criminals. I said so they were criminals protecting criminals asking me not to blame them for crimes? They suddenly were like, <But you're a criminal too, right? Why are you here?> I said Nope. Bullshit. They started asking me if I was a child molester. I told them to look it up. (Last time I answered someone asking me that, I just got in a loop of saying I'm not, and them being like, <are you sure??? What if I loook it uppp?> until I just said, <fucking do it. Look it up. Don't ask me if you're not gonna believe me.> I asked them how they thought it was going to end. They said, <however you want it to.> I said, agreed. How did they think it was going to end? They said it was over right now. I said then they had nothing to worry about. But I asked them, how did they think it was going to end. They said, I had such and such options. Then reiterated however I wanted it to. I said great, I wanted it to end with justice. They started saying, if you want justice, write to the judges. And listed a bunch of supposed names of judges I didn't know. I didn't say anything.

That gang this morning, when I said, it wasn't financially motivated, they can't even use my tablet, countered that crackheads break them open and use the batteries to light up. However, the cell of the prime <K2>-user suspect was raided by the cops, I think coincidentally, very shortly after the tablet was stolen. I heard they had a <wick>. (An abuse of the term. They use tremendous amounts of toilet paper, in the feds, twisting it up into a slow burn fuse kind of thing, to store fire throughout the day, and they call it a <wick>. Out of curiosity what's a technically accurate name for an arrangement of fuel intended to slow down a fire to store it?

If they found a broken down tablet, I'm not sure I would have heard about it, even though it would probably have forensically identifiable serial numbers inside.

The tablet was right after the guy told me not to just leave it where it could be taken, a few days later. And then the same guy told me it was my fault for leaving it where it could be taken. (Which suggests that guy knew where it was in my cell. I suspect the guy that returned it is the thief, not sure though.)

9/23/2026 7:19:36 PM :
Man, imagine having 3 meals a day.

I didn't get dinner today. The prisoners with jobs handing out trays said food services didn't send it. (Again.) The guard that was on shift said food services was called, and would bring it. I said no way, they almost never do. Kept re-assuring me. I asked again after almost an hour. Kept reassuring me that it would come. Shift changed. New guard was Castillo. Castillo said food services had left the building, there was no one to call, I would not get it. I said I was going hungry, there was no reason I should be going hungry, and I can't even eat commissary because they stole my commissary, and FDC did nothing to stop it. Castillo said it was my fault since I didn't protect my commissary. I said, how was I supposed to protect my commissary, my locker's broken. Castillo said, <It's prison... do whatever you have to do... It's prison.>

I talked to an FDC-uniformed human who identified as the warden at <mainline> today, and explained the situation with thefts, and was told I would have some kind of response later today. So far nothing, and it being 18:53 as I write this, I doubt. This is the 3rd time I've been told to wait for a followup, by staff, regarding maybe moving me to PC, and it didn't happen.

9/23/2026 7:34:51 PM :

A few days to a week ago, I approached Lt McDonald during a visit to the unit, and described the thefts that had been inflicted on me. Saying I had no toilet paper. McDonald was like, asking me if it was my first time in prison, saying I couldn't just say out loud in the unit that I was being stolen from, to a guard. McDonald eventually got me toilet paper, and asked if I felt safe. I said I don' want to go to the hole. McDonald said, <okay, you feel safe.>. But said to participate in a followup to be arranged with unit team tomorrow during a certain window the next day, but I didn't because McGarrigle visited me instead. I followed up with another guard later, who talked about moving me to 7, which is the most PC floor, and said unit team would talk to me the next day, but then they never did. (<unit team>'s office is outside the unit, you have to get a guard to escort you to get there.) I told the Warden about the lack of follow-ups, and was told to expect one today, which seemingly didn't happen, but that is starting to rehash the other email I wrote today.

9/24/2026 7:50:09 AM :

The name of the prisoner that brought the tablet back the first time, protected the thief, lied to protect the thief, is <Donny Meija>.

9/24/2026 12:50:07 PM :

Today was commissary. I ordered stamps and a small enough amount of food to eat it when I got it. While waiting for commissary, the mario mushroom tattoo guy was talking to the denizens of the K2 cell, and pointing and laughing at me. Another prisoner threw me out off of a stool at a table. I got taken to the LT's office, and interviewed by a series of guards. The guy that just assaulted me got taken to the hole apparently. Lt. Shelton (spelling?) asked if I was safe to go back to 6S. I explained the situation where I kept being told there would be a follow up the same day or the next, most recently by the warden, but then the followup not happening. I told Shelton <I would probably survive another day in 6 South.> And was taken back to 6 South.

9/24/2026 3:35:48 PM :

Comissary was today. I ordered few enough items I could eat them/use them immediately. However, I missed getting it, because they took me to the Lieutenants' office due to the incident today.
I noticed the bank robber's face is covered in bruises. Asked, but did not get info on who the (multiple, reportedly) other fighters were.

9/24/2026 9:50:22 PM :

Donny Mejia, not Donny Meija.

9/25/2026 2:19:58 PM :

Another burglar in my cell I think: I noticed at 1:53pm today 2026-09-25, that my locker door had been bent open. But I had nothing left they were able to steal this time. I haven't checked the rest of the cell. I reported it to the unit guard, Sissoko, who said I needed to get a key. I said that it didn't lock, it was welded incorrectly. Sissoko told me to approach the maintenance workers when they were on the unit and ask them. This is not a viable option because they lock us in when the maintenance workers are here. Sissoko told me camera footage is unavailable, and repeated that I need to lock it up, and that Sissoko did not know anything about broken doors.

9/25/2026 2:51:50 PM :

I bet Sissoko will not even have reported the complaint to the Lieutenants, which I think is a violation of the SEC.
I wrote SIS, and the warden just now.

9/25/2026 6:05:19 PM :

I was reading through some materials including the BOP guide on malnutrition. I have been recorded as down 13 pounds from my weight at booking of 250 pounds, in a period of less than a month, which falls under the classification of <severe> for weight loss, during my time here. Please let Whalen in particular know that I need that medical record as well as all booking records produced if necessary by subpoena for the upcoming motions, and request help getting the court to produce it. After requesting to have my weight recorded, I also requested any other examination that the physician seeing me about a week or so ago (they took me out and to medical when I refused to indicate that I was okay at count), considered appropriate given I'd been subjected to malnutrition, and the physician decided to give no further examination. (The man claimed to be a <physician>, not a nurse.) I think this was my second medical visit outside of booking? There was one more visit where they checked my weight shortly after that and it was up a little higher.

9/28/2026 7:50:27 PM :

Today I got no vegan tray for dinner, was not offered any tray at all. Was told to wait, and eventually heard from unit guard M . Brennan that the kitchen (represented by someone Brennan described as a bald black man) said there was no such thing as a vegan tray, and they would not be providing me one. No other tray was ever offered to me. I have no commissary food due to thefts and violence against me, therefore I am going hungry tonight again.

Elua, 10/25/2026 10:12:35 PM :

* 8/25/2026 11:33 AM
** Z: Hey, so, the Food Services Administrator was first saying that the <no meat trays> are vegan, and then was saying <but sometimes we're going to put nonvegan things on them and so they're not vegan>, and then was saying <oh we're not going to comply with this diet or whatever because it's like we follow the national menu> or whatever, and so it's refusing to comply with my diet which has been recognized as a requirement by the chaplain. So, I have no BP-8, no BP-9 forms, I have no administrative remedy right now, maybe they're going to try and give me a BP-8 form, like, they could do that at any fucking time just to try and rugpull any ??? or whatever. Maybe the only way to get a fucking BP-8 form is for me to go to court so that they can rugpull my case, and then give me a fucking BP-8 form, cause that's what it kind of fucking looks like. So that then I can file the fucking BP-8 form and then do the whole fucking thing again with the BP-9 form. Like that seems like the only way to fucking progress. Anyway, Fisher is refusing to comply with my diet. That is <Miss Fisher> or whatever, who is the food services administrator. I guess I can write copouts or whatever that Fisher is refusing to comply, and like talk to the fucking warden. I mean, like, this is going in circles, I've like written the thing many times so, like, the doctors are refusing to help me.
** Z: I need a fucking lawyer to fucking talk to me, because I've exhausted administrative remedy, and like, you know, it seems like they're going to try to rugpull me, I mean I need a better strategy than what's happening right now, I need those fucking forms, and I need a fucking lawyer to bring me those forms. Like, that seems like, that kind of seems like the only way I'm going to get food. They're playing fucking games with me trying to say like <oh these trays are vegan>, <oh these trays are not vegan>.

** Me: I've sent Whalen copies of forms BP-9 to BP-11; I've found those and I've emailed those to Whalen, and Whalen acknowledged having received them. I haven't found BP-8 yet. Z: You haven't found BP-8 yet. So am I going to get a visit or not? Me: I'm going to ask Whalen.

** Z: I mean the CFR did not say you have to first try BP-8, it said you have to first try informal relief or whatever, which I have, informally, because that's what ???. And like, you know, they're just trying to do this like double bind to prevent anybody from being able to complain by not handing me the fucking BP-8 . You know, whatever's happening right now isn't fucking working. And I mean, like, Fisher needs to be held accountable for this. Fisher from food services. It came here with its fucking name badge ripped off. There's another Fisher that's working for the institution, that's like in counseling ???. It's like also a black woman. I don't know the first initial Fisher has in food services, but like, you know, it's deciding to violate my rights, you know, it couldn't be more fucking clear that it's obligated to provide me a vegan tray, and like it needs to be held accountable. I mean, what should I do? Try to call one of the injury lawyers or whatever? But like, you kinow, if they help me, then what, I get an injunction, before I starve too much, and like they don't get paid and so they won't help me, right? Me: I'm not sure how they work but like that seems plausible as a way things could shake out. Z: Um, well, well I need a fucking lawyer and Whalen's in another state.

** Me: Right, so I guess, what kind of lawyer are you looking for, civil lawyer or what? Z: Yes. The kind that can get me a BP-8 form and win injunctive relief. Like, a BP-8 form has probably been filed as an exhibit in one of these cases where someone proved exhaustion, and so a law

library would probably have it, right? I guess I will see if I can find the form on one of the computers here.

* 8/24/2026 12:21 PM
** Z: It's not letting me use the computer, which means that I can't add Whalen's phone number which means I can't call the public defender. I tried using the booth, but it didn't cooperate with me, it had a list of the districts of federal public defenders, and the one that Whalen is from is not actually on the list, and so, anyway, I mean, I have exhausted what's available to me at the moment. I talked to the active or associate warden, who seemed to be saying that they would talk to food service to get it resolved, and maybe that means that I will have a vegan meal for dinner, I don't know, did you get my texts from recently? [discussion of text messages]
** Z: So I don't know if they're like blocking me from using the computer for some stupid reason, and I don't know if I'll only be able to talk over the phone, or maybe not even be able to talk over the phone. Like, I asked for BP-8 and BP-9 forms, and they said that they didn't have them. So, I mean I asked at [handling? mainline?] like they said, which is like some humans from the staff of the jail come talk to you or whatever, and they said to ask 10 minutes after that, and I did, or I tried to, but the office that they said to go to was empty. So as of right now, the administrative process is unavailable, I mean I'll try to get in contact after dinner or whatever if they have a vegan meal for me or whatever.

* 8/26/2026 12:00 PM
** Z: So, I almost just got sent to the SHU but I guess not yet or whatever. But anyway, I just got the tablet. The commissary food portions a lot larger than I expected, it's bigger than, I mean it's better than ACDC. And it looks like maybe somebody unofficially is making some kind of effort to give me vegan trays. You know, no meat trays, or whatever, but with no eggs on them. Maybe it's someone in unofficial capacity in the kitchen or whatever. Me: I see. Z: Anyway, I mean this place is a lot more like Petersburg than George Hill or whatever, you know?

Ziz, 10/26/2026 9:34:44 AM :

I'm pretty sure that's all stuff I said over the phone to you from in here. When you put a square bracketed "handling" or "mainline", it's "mainline".

# IN THE CIRCUIT COURT FOR ALLEGANY COUNTY, MARYLAND

STATE OF MARYLAND

vs. C-01-CR-25-000334

MICHELLE JACQUELINE ZAJKO

## MOTION TO DISMISS

In the interest of Hope, Justice, and Truth, for the good of all people, and for the establishment of a true peace, the defense moves to dismiss this case. In support of this motion, the defense brings the following to this court's attention:

1. That on 2025-02-27, a «Lt. Gilpin» sent copies of clearly-marked legal notes taken from the defendant with the FBI, which passed them onto the state's attorney. (Ref: FD 094, FD 094 1A).
2. That the stack of legal notes, which were copied out of order, were clearly marked as «LEGAL NOTES» and included the following topics: the injuries the defendant sustained during her arrest, the name of a civil attorney, her religious sentiments, requests on who she wished to be put into contact with through an attorney, thoughts on her innocence in this case, on the circumstances of her and her co-defendants' arrests, and the abuses she suffered in jail. Some of those notes were taken during a meeting with the defendant's counsel at the time, Rebecca Breedan, on or around 2025-02-17. The notes included information that was written solely to be passed onto an attorney, in relation to requests for legal advice. The stack also contained a note written by Rebecca Breedan to the defendant, with regards to her case. (Ref: FD 049 1A).
3. That a member of the jail's staff was caught by the defendant reading her privileged legal notes and correspondence between her and her attorney during the pretense of a cell search. When questioned by the defendant, the guard confessed to the defendant to reading through legal notes and legal correspondence (all of which were clearly marked). The guard claimed to be looking for something to report. Further, the guard [redacted] claimed it was jail policy to read legal correspondence and legal notes, in a clear effort to take advantage of the defendant's ignorance of the state's formal recognition of her rights at that time, and to cause her to fear that disclosing information on her innocence to her attorney and keeping records of the disclosure and legal advice provided to her would result in whatever she told her attorney being passed onto the state's attorney, which might use that information to further persecute her. After the aforementioned statements, the guard went back to slowly reading line-by-line her legal notes.

and legal correspondence between her and her attorney, Mckinley.

4. That the defendant additionally memorialized at least one instance of guards searching through her legal notes by discussing an instance of it while being secretly recorded by another prisoner. (Ref: 2025-03-31-20-26-09.WAV, starting at 03:30).

5. That Ziz has described a pattern of guards repeatedly violating attorney client privilege. For example, in this 2025-09-21 grievance excerpt: «The evidence I have just mentioned may need to be subpoena'd [sic] as your guards have interferred [sic] with my trial by repeatedly bursting into the room, after hovering outside trying to listen, to privileged attorney client communications.» (Ref: Lasota Inmate Grievance History VendEngine.pdf from the Supplemental Discovery dated 2025-12-04.)

6. For another example of jail staff apparently being caught seeking communications with defendants and attorneys, Ziz remarked at a hearing that she made white noise while meeting with a defense attorney, and had whispered during that meeting in order to maintain their privacy, as the room they were meeting in (the library) had surveillance equipment installed, which she evidently believed to be on and recording. She claimed Gilpin confronted her about it (when Gilpin shouldn't have even known she was whispering or using white noise, as the surveillance equipment was supposed to be off, and it was supposed to be a private meeting, thus validating her concerns.) During that confrontation, Gilpin accused her of «doing what you're not supposed to be doing» by doing that, to which she said, «So you were recording that conversation?» and Gilpin said, «I know what you're doing. Trying to twist the rules to your advantage.» (This was after the guards assured attorneys there was no recording equipment.)

7. That the jail staff have clearly sought to obtain and disseminate to the regime privileged information such as legal notes, in violation of due process, as there is evidence of such violations in discovery. These acts are an attempt to normalize deviance and the assertion of absolute power over pretrial detainees, and thus constitutes an attack on the rights of all people. (Ref: 094 1A).

8. That in addition, these violations impede the defendants from having an open relationship with their attorneys, due to the threat that if the defendants do not censor themselves around their attorneys, then whatever they say or ask of their attorneys will be illicitly used by the FBI and state's attorney against them. The defendant notes this matters regardless of a defendant's innocence: the defendants hold that the state's attorney is not engaging with the defendants in good faith, because (among many other reasons) the state's attorney has had access to evidence which proves the defendants weren't trespassing since as early as March,

yet still continues to falsely charge them with trespassing. The defendant notes that if one entity is trying to frame another, the persecutory framer must avoid contradicting the truth as much as possible. If the state's attorney knows something is true but that the defendant can't prove it, then that is valuable strategic information that it could use to dodge exonerating evidence in an illicit attempt to frame her. Thus, this defendant has been concerned that providing more information on her own innocence to her own assigned attorney would be in error, as that information may be leaked to the state's attorney, and would enable the state's attorney to more effectively persecute her. That is the sort of environment the state's attorney and jail staff have created, here. And this sort of dynamic is exactly what attorney-client privilege is designed to prevent, as it's been formally recognized by the state that one cannot have a fair trial under such oppressive circumstances. (Ref: Audio 5131.Wav, FD 09, FD 69, A2025-02136 Found Property Report, FD 165; federal documents were used in the March 19th Grand Jury proceedings, so it is probable the state's attorney had access to these files at that time. There were cops at the road on February 16th, 17th, & 18th. The FBI clearly knew which road we were on and that it was public, given what they must've asked Fink and given that the FBI humans actually admit to having visited the road while the trucks were still parked there, on the 17th. It strains credulity that by the date of the Grand Jury inquest, the cops all suddenly and in coordination forgot which road the defendants were parked besides. Worse, they changed their story in a way that falsely incriminated the defendants, by falsely claiming the defendants were on a road that was private.)

9. That the state's attorney acted to conceal the documented violation of due process in the Federal Document 094 1A perpetrated by a «Lt. Gilpin» as described by delaying the release of the discovery to June, beyond the discovery due dates twice over. That in violating the defendant rights and through the further violation of concealing the initial violation both through delays and through attempting to create a conflict of interest between the defendants and their attorneys such that they would be less likely to notice the aforementioned violation through an illicit gag order, the state has abdicated law by declaring the defendant outside of its protection by denying her equal protection under the law. (Ref: MD- rule 4-263(h) 4th, 5th, 6th, & 14th Amendments of the U.S. Constitution).

10. That the above were not the only violations. A so-called «wiretap» was conducted through the state's attorney's office with the aid of a so-called «confidential informant» on the defendant on March 31st, in which the confidential misinformant sought out information on the defense's legal strategy in this case explicitly and repeatedly, in addition to advising the

defendant to disregard advice from another prisoner and keep her attorney, George Mckinley, after another prisoner advised that the defendant should be made aware of an alleged close personal relationship between Mckinley and the state's attorney. The prisoner, who claimed to have known Mckinley since early childhood, remarked, «he gets high, he drinks, he is involved with the people, the state's attorneys are his friends, you know what I'm sayin'? Like all the judges are his friends. He can get people good deals» but «these are his peoples. Like the number one prosecutor and attorney James Elliott, he used to be a public defender. Him and Mckinley are very close.» The prisoner held that Mckinley didn't really fight for her. The confidential misinformant repeatedly contributed to this conversation. At 23:51 the prisoner says, «He's gonna try to get you not to go to trial because he's gonna wanna give the state what they want.» The defendant says, «Well, I want to go to trial.» At 26:16 the confidential informant explicitly endorses Mckinley. At 27:28 the defendant remarks, «there's zero chance I'm taking a plea. Zero.» (Ref: "D:\Zajko\Pennsylvania\Recordings Made Pursuant to Pennsylvania Request\Recordings\2025-03-31-16-26-23.WAV").

11. That later, the confidential misinformant advised the defendant to disregard what the other prisoner said about Mckinley. The confidential misinformant had been made aware that the defendant would refuse to take any guilty plea due to her religious beliefs, and thus any lawyer who would pressure the defendant into taking a plea, or who would give the state's attorney what it wanted in this matter is an inappropriate choice for a lawyer for her. The confidential misinformant violated the defendant's right to due process. (Ref: 2025-03-31-16-56-21.WAV, at around 6:43).

12. That the confidential misinformant also provided the defendant additional legal advice on her Maryland case. Later, the defendant disclosed parts of her legal strategy, an explanation of what she was doing in the area, and commentary on the ownership of the guns and other objects found in the trucks and their purpose, among other things to the confidential misinformant while under so-called «wiretap», much of what was said at the confidential misinformant's prompting. This was a blatant violation of due process. (Ref: 2025-03-31-19-56-10.WAV 09:21 & 14:14; 2025-03-31-16-26-23.WAV 00:38 & 01:09).

13. That at a separate time, while the confidential misinformant was alleged to be in contact with members of so-called «law enforcement agencies», that same confidential misinformant claimed to the defendant that the defendant's charges here in Maryland would be dropped or reduced if she stopped speaking about a cover-up in Vermont, with regards to a border patrol agent committing the murder of Ms. Bauckholt, and the attempted murder of Youngblut, among other cover-ups. The defendant refused.

Notably, then that same confidential misinformant threatened that the defendant's food in jail would be poisoned, or else that the defendant would be murdered upon extradition, if she did not stop speaking out against cover-ups. (Ref: Regarding the corroborated claim the misinformant was in contact with member of so called «law enforcement agencies» see "D:\Zajko\Pennsylvania\Recordings Made Pursuant to Pennsylvania Request\Body-Worn-Camera - Subject to Protective Order.mp4", for a ref on the death threats, see the defendant's statements to the press from July 2025).

14. That the confidential misinformant is recorded describing its state of mind when speaking to the defendant to a presumed member of the state's attorney's office. In that video recording, it said that when it talked to the defendant, it talked about «whatever they [here the misinformant clearly gestured to the human wearing the body cam, presumably an employee of the state's attorney's office] want me to talk» about. That statement implicates the state's attorney's office and their accomplices in the death threats. It also implicates them in the misinformant's efforts to gather information on the defendant's religious and political beliefs. That's significant because the defendant's religious and political beliefs have been made pressure points for the death threats e.g. abandon all political action or die, ritualistically renounce your soul according to your religious beliefs concerning justice in what is called a «plea deal» or suffer hate crimes initiated by the Christian «exorcism» etc.

15. That the misinformant gave the defendant the impression that these threats were coming from the FBI or some other federal agency, and that humans from some agency had reached out to the misinformant (either through the misinformant's brother who worked in D.C., or through the state's attorney's office), and had wanted to use that alleged "friendship" between the misinformant and the defendant as a backchannel to impress upon the defendant just how far they were willing to go to secure the defendant's silence through that alleged "friend", and have that alleged "friend" (the misinformant), acting as a reluctant messenger alleging itself to be acting out of concern for the defendant's life (note that this claim of reluctance and concern for the defendant's life was obviously a pretense, as per the bodyworn camera footage,) to convince the defendant to participate in the regime's coverup. The defendant was encouraged to falsely incriminate one of her co-defendants, Mr. Blank, in order to «save» herself. She refused. The misinformant also tried to convince the defendant that her loyalty was misplaced, because the misinformant falsely alleged that Mr. Blank had lied to her about an alleged extensive criminal history. (Mr. Blank has no criminal history.) The misinformant asserted that the defendant was «in over her head» and had gotten caught up with «bad people» and that if she kept defending them, something bad would happen to her. The defendant said that none of

that was true, (or something to that effect). The misinformant said that the defendant could only formally deny the ones making these death threats so many times before they'd murder her (if the defendant recalls correctly, that number was two times), with regards to the extradition threats. The defendant will not falsely incriminate her innocent friends or herself; she has no price or limit. If she were to have a limit where she'd break under some amount of torture, then these conspirators would be incentivised to exceed that limit. As a consequence, a person of integrity must be willing to suffer any torture or death, rather than commit a wrong act. That is part of what it means to have principles & to act with integrity.

16. That this is not the only time someone who the defendant suspected of being an informant made a threat on her life while in Allegany County Detention Center. A prisoner named S. Bright behaved in a similar way to the aforementioned confidential misinformant, expressing strong interest in the defendant's legal strategy, her relationship with her lawyer, and attempted to acquire information on the defendant's trespassing and gun charges. Bright, like the confidential misinformant, claimed to have a relative in D.C. and a source of inside information, and then strongly advised the defendant that for the sake of her continued future health and wellbeing, that she stop speaking up about the government committing cover-ups, and alluded to this "advice" coming from some inside source, perhaps in "law enforcement". The defendant replied that she had a moral obligation to stand up against injustice. Bright said something to the effect of that something bad would happen to the defendant if she didn't stop. The similar threats indicate collusion.

17. That the confidential misinformant wasn't even the only human claiming to be working for «US law enforcement» who attempted to pressure the defendant into taking a plea deal. On the evening of 2025-10-23, the defendant was placed with a new cellmate, T. Roberts. That next morning at or around 9AM, Roberts began attempting to pressure the defendant to reveal what she knew about what had happened in Vermont, and whether the defendant did drugs. The defendant refused to answer any in-depth questions on these topics. Roberts kept acting to have the topic of conversation be court cases, much like the misinformant and Bright. Roberts began vehemently insisting that the defendant take a plea deal, heavily pressuring the defendant and becoming increasingly flustered when she said she wouldn't. The defendant explained that due to her religious beliefs, she would not knowingly and willfully make a false statement of guilt that she had acted unlawfully. She explained something to the effect of that a formal knowingly and willfully given declaration of guilt is a kind of performative statement that has to be true because you said it. (Philosophers give the example of «I do» at a wedding) A plea deal, in the case such as the defendant's where she is innocent, would be taking valuable consideration for perjury. And therefore a relatedly

guilty act in itself. A state's attorney who attempted to coerce her into making such a false statement would be suborning perjury. To elaborate on the defendant's religious objection, a formal proclamation of guilt, knowingly & willfully given, is to make an outward sign which may be regarded as the thing signified by that outward gesture. The defendant's religion teaches that to knowingly make that outward sign is to formally declare one's «self» as damned and thus be barred from her religious community. It is the act of an apostate by being blasphemy against the goddess of Choice, and a formal renouncement of faith, through the repudiation of one's own sacred Free Will. A person can always choose to do no evil, and therefore should. Roberts said that instead of defending Youngblut's innocence or her own, that the defendant should just give the state's attorney what it wants, then join a nonprofit like the ACLU, and give up on defending Youngblut from a cover-up. The defendant noted that Roberts seemed to know far more about her case than the defendant had told her. The defendant began questioning Roberts, and after about ten minutes Roberts admitted to having been paid by the cops to provide confessions to them. Roberts then admitted to feeling used by them, because once Roberts had only been paid with a bus ticket, in spite of personal risk incurred to Robert life. Roberts, after admitting to having been employed by the state, then asked the defendant if she accepted Jesus as her lord and savior. The defendant doesn't belong to any Christian denomination, and said so. Roberts insisted the defendant needed Jesus. Roberts made the false claim that every human person is guilty of having done evil, so functionally it shouldn't be a big deal to the defendant to commit an act of damnation by falsely confessing to a crime. The defendant doesn't believe in original sin, and remarked that she had done no evil. At that, Roberts became loudly aggressive, claiming that the only sinless being was Jesus, that the defendant needed to take a plea deal, that it wouldn't be a sin to take a plea deal as the defendant had described, because the defendant was already guilty of sin, so that the defendant just had to take it. The defendant said no, that she had never acted out of malice, and reiterated that she wouldn't lie because that would be wrong. Roberts started screaming that the defendant was possessed, and proceeded to nonconsensually attempt to perform an exorcism on the defendant, demanding that a "demon" be driven out of her, said/shouted «I REBUKE YOU IN THE NAME OF JESUS!», and demanded that the defendant convert to Christianity. The defendant, in the midst of Roberts' continued violation of her rights, asserted between and over Roberts' exorcism-shouts, that she wasn't possessed, that she didn't want to convert to Christianity, and repeatedly demanded

that Roberts leave her alone. Roberts refused. Roberts said, something to the effect of, «if you don't take a plea, they'll keep you here for the rest of your life!» The defendant said that they wouldn't, and Roberts threatened that the state would «make something up» just to punish the defendant for not falsely incriminating herself. Roberts continued with this illicit behavior until a guard, B. Jones, told Roberts to stop. Once the guard left, Roberts continued with this behavior, albeit quieter, until the defendant was called away by an attorney visit. At that meeting, the defendant's assigned counsel claimed that the state's attorney had just sent the defendant's attorney a formal plea offer of time served. There had been no other formal plea offer in the entire time the defendant had been held prisoner, which at that point had been 4 months, and calling it a coincidence that the very day the defendant receives a formal plea offer is the same day an admitted informant manaically insists that the defendant must take a plea deal strains credulity. You might imagine the defendant's outrage. After the attorney meeting, when the defendant went back to her cell, she noticed that her legal papers and folders clearly marked «LEGAL» had been moved across the room, and the defendant strongly suspects they had been looked through. The defendant then wrote down all that she could recall of the morning in detail, and then contacted the press, where she again recounted these events while they were still fresh in memory. It is from those summaries that this point is composed. (Ref: see the defendant's comments to Chris Heath from 2025-10-24 over the PayTel messaging app).

8. That this outrageous series of events, a few of which were likely caught on camera, in fact amount to a serious violation of the defendant's constitutional rights: an informant acting in return for valuable consideration, whether that service be a formal or verbal agreement, is acting in the employ of the state. It is entirely impermissable for anyone working for the state, in the course of their alleged duties, to attempt to coerce an individual into changing their religion. In Mahmoud v. Taylor 2025, Kennedy remarks that «at its heart, the Free Exercise clause of the First Amendment protects «the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through the performance of»» religious acts. The defendant's religion teaches that to knowingly and willfully take a plea deal is a religious act, the forbidden demonic rite of soul-renunciation, a ritual the damned perform to forever leave the faith, which in addition bars them from ever rejoining it. The Free Exercise Clause certainly guarantees protection against compulsion or coercion to renounce or abandon one's religion, and «that restriction applies equally to the states by way of the Fourteenth Amendment» in Cantwell v. Connecticut. Roberts used the threat of phony charges to create a chill upon the defendant's First Amendment rights, and while acting as an informant, attempted to coerce the defendant into renouncing her religion. (Ref: Mahmoud v. Taylor 2025, Cantwell v. Connecticut 1940).

19. That further, the defendant would remind the state that their courts are not to evaluate and are in fact prohibited from evaluating a religious belief for ecclesiastical purposes. The extent to which the defendant has not formally codified her beliefs is of no concern; the Free Exercise clause does not require the codification of religious tenets nor does this clause define the scope of religion. Also irrelevant is this court's opinion, if it has one, on the validity, the reasonableness, or the merits of the defendant's religious beliefs. The Free Exercise clause is not even restricted in its protection to formal ritualistic acts of worship common in theistic religions but also includes the practice or exercise of religion which is binding in conscience. (Ref: State v. Yoder 1971).

20. That in February, another suspected informant, Shyanna Wingfield or Whitfield (or some very similar last name), also attempted to question the defendant, falsely alleging that a gun alleged to have been found on Youngblut in Vermont had been used to murder the defendant's parents in what the defendant assumes was an absurd fishing attempt. Shyanna began attempting to offer legal advice to the defendant in the Maryland case, among other things pressuring the defendant to talk to and cooperate with the investigators, claiming that she would only look more suspicious if she didn't. The defendant responded to this by pointing out that it's standard legal advice given by defense attorneys to not speak to cops, and that anything she said to a cop would be used against her, and that Shyanna's advice was thus bad. Shyanna also attempted to pressure the defendant into discussing drug use, and then attempted to pressure the defendant into talking about alleged boating accidents. When these lines of questioning failed, Shyanna took a note the defendant was alleged to have written and turned it over to the guard. The note contained nothing incriminating. However, Shyanna was allegedly seen by several other prisoners, who began shouting at Shyanna over this behavior.

21. That the defendant notes that a certain prisoner approached the defendant in February 2025 to warn her that prisoners were being called to Lasher's office and questioned regarding what the defendant spoke about with them. The helpful prisoner who warned her asserted that prisoners held in Allegany County Detention Center were under the impression that if they provided information which could lead to a conviction on the defendant to Lasher, who was alleged to be working with the FBI, then they would get a shorter sentence or be sent to rehab (instead of prison) as a reward. The defendant questioned one of the prisoners who the helpful prisoner pointed out as one of the ones who had been questioned by Lasher, C. Porter. When questioned, C. Porter confirmed the helpful prisoner's assertions. Porter admitted

to having been called up to administration and to having been questioned regarding the defendant. Porter said that they were asking about the defendant's case (meaning the Maryland case), but that Porter told them (the administration) that the defendant hadn't talked about her case with Porter. Indeed, multiple prisoners came up to the defendant and questioned her regarding what she was doing in the area, and asked her many questions about her Maryland case. That the jail's administration was asking prisoners to do this is a blatant violation of due process and her Sixth Amendment right to an attorney.

22. Taylor v. Sterrett, 532 F.2d 462, 73 (5th Cir. 1976) states that «incarcerated individuals have a right to «uninhibited, confidential communications» with their attorneys». Under the Sixth Amendment, «[i]n all criminal prosecutions, the accused shall enjoy the right... to have the assistance of counsel for his defense». In Massiah v. United States, 377 U.S. 201, 206 (1964), the so-called «Supreme Court» held that a defendant is denied the basic protections of their Sixth Amendment right to counsel when agents of the government deliberately elicit statements from them. In United States v. Henry, 447 U.S. 264 (1980), the court held that federal agents deliberately elicited information by contacting a known informant and giving him instructions to pay attention to statements by the accused, but not to ask questions about a robbery for which the defendant had been indicted. Matteo v. Superintendant, SCI Albion (1999) lists three basic requirements for a Sixth Amendment violation: first, the right to counsel must be attached. It certainly has been, here. Second the informant must've been acting as a government agent. There is no doubt that the misinformant was acting as a «government agent», as there is paperwork and bodycam footage to that effect. Others, including but not limited to Shyanna and Roberts may clear this bar as well. Third, the informant must have been engaged in «deliberate elicitation» of incriminating information from the defendant. See also United States v. Merritt (2013). When the misinformant asked the defendant about whether the guns belonged to her, the misinformant was acting as a «government agent» engaging in deliberate elicitation of information, with the intent to incriminate the defendant in the Maryland case, for which the defendant had already been indicted for (thus attaching the right to counsel). While there is audio of the state's attorney explicitly telling the misinformant not to talk about the case, this «government agent» asserted it said that when it talks to the defendant, it talks about «whatever they want me to talk» about, meaning the state's attorney's office. That's on camera, and that statement implicates the state's attorney. It's also not sufficient to abrogate the rights violation by stating that the state's attorney is absolved of responsibility because it asserted to the misinformant that it shouldn't seek out information pertaining to the case. The violation is real and realized. Don't forget to consider that the state's attorney then compounded the violation by concealing it for 7 months.

It's outrageous, too, that a «government agent» threatened the defendant with death if she didn't cooperate with the regime's attempts to falsely implicate her friends in crimes, and as the misinformant offered that the MD charges would be dropped or reduced if the defendant perjured herself, that too implicates the state's attorney in another Sixth Amendment violation, and is subornment of perjury. Shyanna and Roberts attempting to pressure the defendant into talking about her alleged drug use and providing her «legal advice» on the Maryland case may also be put in for consideration for a Sixth Amendment violation. In general, the jail's administration's alleged practice of calling up prisoners and asking them if they heard the defendant say anything incriminating about the MD case and giving them the impression they'd be rewarded if they could provide that information may also be put into consideration for a Sixth Amendment violation. (Note that unlike a First Amendment access to the courts claim, a plaintiff need not show actual injury to state a claim of unreasonable interference with her Sixth Amendment right to counsel. See Strode v. Pacl 2021. However, in this case the defendant (& future plaintiff) alleges injury. It would be impossible to argue that the state's attorney secretly having an overview of the defense's strategy, for example, as if it had attended a meeting of the defense team at which defense plans were reviewed, doesn't amount to a major invasion of the defendant's Sixth Amendment rights, & equally impossible to argue that the state's attorney didn't make or intend to make use of that illicit advantage, as it concealed access for seven months.)

23. That this defendant would further note that most defendants would claim that continued incarceration is torture. Most defendants would take a plea deal that would falsely implicate them in crimes they didn't commit, just to escape the torture of jail. The defendant does indeed claim to be being tortured — the jail keeps the lights on (though sometimes dimmed somewhat, it is bright enough through the night to read a book with no eyestrain) 24/7, which is classified as torture, and she and her co-defendants have been exposed to violence, terror, arbitrary punishments, molestations, death threats, and other abuse while illicitly held captive. The defendant interprets the offer of a plea deal itself to be an illicit attempt to coerce her into renouncing her faith and into committing perjury, because they are torturing her via continued imprisonment under conditions that are torture, & are functionally offering to stop torturing her if she commits perjury, etc. The regime has access to information which would reliably prove her innocence & information regarding her religious beliefs, which highlights their culpability.

24. That to expand on the accusation that the state's attorney is suborning perjury, the defendant raises the following issue: as the defendants know they weren't trespassing on 2025-02-16, to plead guilty to unlawful possession of LSD and firearms would be to reify a search based on a false arrest for trespassing which did not occur, thus implicitly reifying the accusation of trespassing. The state's attorney, state's attorney's office, and their accomplices have in their possession information which

confirms that the defendants weren't trespassing on 2025-02-16. They have had evidence that the road was public since as early as February 16th, and began making misrepresentations about which road the defendants were on, as though to bluff the defendants, who might not be familiar with the area, into falsely believing they were on a separate private road. However, the defendants weren't bluffed into falsely assuming guilt, as they had done their due diligence with regards to checking whether the road was public or private, had confirmed the road was public through the Maryland Registry, and had even (bizarrely) received permission to be on that (public) road by James Broadwater, who had falsely claimed to them that the road was private. The state's attorney's office has had the evidence that there was no probable cause to detain the defendants for trespassing, (as the 911 call itself fortunately includes Joe Broadwater asserting twice over that the defendants had permission to be there,) from the start of their phony investigation. They further have had evidence since March that Joe Broadwater made serious material misrepresentations in the 911 call, as to the status of roads on that mountain and the status of the road that was in question. And if there's no probable cause to detain someone for trespassing, then there's obviously no cause to arrest them for trespassing, nor cause to get a search warrant on their homes based on trespassing. So by bribing the defendants with the offer of if they falsely admit to guilt they will in exchange be released from torture, the state's attorney is suborning perjury.

25. That indeed the misinformant's original claims as to why it targeted the defendant implicate a violation of the First Amendment, as well: during a recorded meeting between the state's attorney & the misinformant, the misinformant stated, «[T]o me, she's delusional [inaud] she's delusional [inaud]. We were talking about her case today and the mindset this woman has, like it's mindblowing to me. And I'm like... do you have no... like–» (Elliott interrupts to ask if the misinformant is claiming the defendant is actually crazy or not, & the misinformant says no) then continues, «like I know to [the extent?] of my case [inaud] that I'm guilty on certain parts–» (here Elliot interrupts to tell the misinformant not to say that (which demonstrates that Elliott prefers to actively protect this criminal accomplice, when it is not even Elliott's job to do that, & Elliott does not have the interests of justice at heart.)), «but because – I admit what I did – it was wrong.» Based on the defendant's recollection of conversations with the misinformant, it appears that the misinformant is speaking of the defendant's religious beliefs, in particular comments downstream of how the primary tenet of the defendant's religion is to do no evil, and so she does no evil, and that in accordance with that, the defendant has avoided doing evil. The misinformant reacted with barely-disguised vitriol at the defendant's religious beliefs, believing that everyone is guilty of something, & would disgustingly assert it didn't care if she was a murderer, over the defendant's assertions that she wasn't and that it would matter. It is not that the defendant is refusing to admit that she does evil, it is that the defendant actually does no evil, and has no guilt to confess. This defendant holds that to knowingly and willfully harm an innocent as an act of aggression is to commit an act of evil. To do evil is to blaspheme against the Holy Spirit, something this defendant would never do. The defendant believes from her recollection of the

misinformant's acts. Even from the recordings that the misinformant sought to punish the defendant for her religious beliefs, by falsely implicating the defendant in crimes, as if being falsely convicted could damn a person to perdition. The state does not have that power. The misinformant committed what amounts to a religiously-motivated hate crime while working for the state, by knowingly falsely implicating the defendant in crimes out of hatred for her due to the defendant's religious beliefs, which was a crime, to be part of its work for the state. (Ref: "D\Zajko\Pennsylvania\Recordings Made Pursuant to Pennsylvania Request\Body_Worn_Camera - Subject to Protective Order.mp4").

26. That Bruckner is the evil that knows itself for evil and hates the good. The state's alliance with Bruckner's vitriol not against guilt, but against refusal to confess guilt without regard to the truth of the confession on the blanket presumption that there is no innocence, constitutes a campaign directed against innocence itself, which has found its mark in the defendant. And cooperation in this alliance is inherently damning on the matter of malicious prosecution, selective prosecution, outrageous governmental misconduct against the interests of justice, and in the eyes of the divine.

27. That the state resorting to such tactics as this delegate employed, through this delegate, is just another instance of the state throwing away the appearance of due process, and violating the defendant's constitutionally acknowledged rights.

28. That the jail's staff, state's attorney, and their accomplices have behaved throughout the last eleven months as if the defendants belong to a special class of persons for whom the rights acknowledged by the constitution and the protection of the law does not apply, while simultaneously using a mockery of the law and implicit (and explicit) assertions that since these perpetrators claim to have power, they may do whatever they want to the defendants, whether that be read their legal correspondence or notes and pass them on to the FBI, conceal exculpatory discovery, employ a human who issues death threats, employ humans who attempt to coerce the defendant into renouncing her faith, and other outrageous violations of their rights formally recognized by the state. They continue to commit these outrageous crimes because so far, no one has stopped them.

29. That the high degree of dishonesty in and around the «wiretaps» confirms the likelihood that the application for a wiretap contains perjury itself. However, the defendant is unable to read the entire application, as it is largely redacted. The defendant moves to compel for sanctions for portions of the application naming any claims the misinformant made to be unredacted, as they are almost certainly false statements, and so for any other applications for wiretaps from the state's attorney in order to see if there is additional material with which to strengthen an argument for having a Frank's hearing over that

application and any others.

30. That regarding the aforementioned so-called «wiretap» carried out by the misinformant, that audio has been available to the state's attorney since as early as April 1st, and the state's attorney acted to conceal the wiretap, and thus the knowledge that the state's attorney has possessed information on the defense's legal strategy since as early as April 1st, for 7 months, ignoring any and all discovery due dates, & thus violating due process & exacerbating/compounding the Sixth Amendment violation.

31. That information on this so-called «wiretap» was only provided to the defense shortly before the previous trial date, when they would've been unlikely to listen through 24 hours of audio to find the offending information, meaning the defendants would've gone to trial not knowing that the state's attorney had had access to their defense strategy all along.

32. That there was no cause to conceal this wiretap. The wiretap contains no incriminating confessions regarding any events in Pennsylvania, but does contain strategic information on the defense's strategy in Maryland. The misinformant fully impeached itself in the 10 minutes after the completion of the wiretap, in the debrief with an investigator, which was recorded on bodyworn camera. For example, during the «wiretap», regarding the defendant's alleged first thoughts after she had heard from the cops that her adoptive guardians had been killed, she claimed to have wondered whether, quote: «Richard had shot Rita and then shot himself». The confidential misinformant then asked: «were they shot?» and the defendant responded, «Well, he had, I think he had like a rifle or something? I don't know. That was one of the things that crossed through my head, because like, because those two got into lots of violent fights with one another, and I thought that – like, he had hit her before.» At no other point does the defendant mention a rifle. That and the fact that the conversation was being recorded didn't deter the misinformant from lying, however. After the wiretap, on bodycam footage, the misinformant falsely described that recorded interaction to the investigator: «she was talking about the murder of her parents, but I was like do you know what kind of gun they used [inaud] and she goes «oh, the officers said like, said like a rifle!» And she was like, «oh! I didn't mean to say that!»» The defendant would also note that she has also never said, «oh! I didn't mean to say that!» with regards to any conversation she had with that misinformant. For another example, the misinformant asked during the wiretap, at around 5:21, «at least you went to the funeral, right?» In response, the defendant said, «yeah». The misinformant responded, «that's good, alright,» and then asked about the details of the funeral, which the defendant provided. During the conversation with the investigator the next day, which was recorded on bodycam, the misinformant falsely claimed the defendant claimed to have not gone to the funeral

This demonstrates that the misinformant heard, for ex, the defendant when she said she went to the funeral & understood that the defendant went to the funeral, & then lied about what the defendant said to investigators employed by the state's attorney the very next day. There are in fact many more examples of such absurdly blatant lying throughout the debrief, and even within the wiretap itself, where the misinformant goes & lies to other prisoners about what the defendant said during other parts of the wiretap. The acts of the misinformant are clearly malicious. (Ref: 2025-03-31-15-56-25.WAV, "C12025.00086_C1198 4 1 25 BWC.mp4.mp4").

33. That additionally, the defendant, in statements to the press from May through July, claimed to have acquired information that the misinformant was a confidential informant, and names it explicitly. These texts to the press were available to both the FBI & state's attorney, the latter certainly by the discovery due date in July. The state's attorney provided one of these text chains in the discovery, by 2025-07-02. Texts included commentary to the reporters Chris Heath and Jo Dodds. In one the defendant says, «I've received threats from someone who I suspect is a confidential informant, months ago. The human asked me if I had political ambitions, asked me something to the effect of if being in jail was enough to dissuade me from having political ambitions, and strongly suggested that I stop speaking to the press, and stop doing activism, else someone would poison my food. This human hinted at having some association with the FBI.» The defendant also explicitly named the confidential misinformant to Jo Dodds, and describes the threats in more detail. «One was in the form of, if I don't take a plea deal and waive extradition, then my food will be poisoned. That was followed up with some sort of about maybe something would happen to me if I'm extradited, another threat about about how, if I didn't stop my activism, then I'd have my food poisoned, and a comment that if I stopped my activism, then the charges would be dropped.» Bruckner gave the impression these threats came from the FBI. (Ref: FD234, texts sent on or around 2025-05-12T16:11 & 2025-07-01 over paytel).

34. Evidence the defendant was speaking about that misinformant to the press can be found in 2025-03-31-14-26-29.WAV at 14:55, for an example.

35. That in the over 120 files the state's attorney provided to the defendants shortly before the Jan motions hearing, many of which were created before June & some of which contain vital exculpatory material (& thus are evidence that Ellis &/or the FBI is filtering out exculpatory evidence - see FD 088 & 101, compared to the 911 call & IMG_0798.HEIC & BWC GPS location & heading in 20_Piney_Mountain_Incident_02_16_2025_17_05_36 Wesley_Miller.mp4 @ 6:40 which proves both that we're on a public road and that Joe Broadwater lied to the FBI multiple times over) relevant to the case which should've been released by the discovery due dates, there is a file which summarizes a call between the misinformant & another individual which both provide evidence that the FBI was meeting Bruckner in the time-frame that the death threats were made (March), & that the misinformant was acting on an illicit motive: «In a video visit on 25 March 2025 at 9:46PM, Bruckner called Holm. During the call, Bruckner stated "the feds" took her out of her dorm for three hours "to talk about that girl who killed, who killed her family» and, «During this call, Bruckner stated she told the "feds" she would help them for help with her time.» (Ref: FD 177).

36. That Bruckner and one or more unknown FBI agent & possibly the state's attorney, by allegedly conspiring to coerce the defendant into committing perjury through the use of death threats, & to influence through these threats her possible testimony and silence her religiously-motivated political support of murder victims, victims of child sex abuse, & attempted-murder-victims, not only attempted to tamper with a possible witness & victim, but did take actions specifically intended to inflict severe mental pain and suffering on her via the threat of death from poison, for example, which meets the regime's def'n of tortur (Ref: 18 USC Ch 113C sec 2340, 18 USC Ch 73 Sec 1512).

37. That the defendant here declares her intent to sue those responsible for the death threats, defamation, false incrimination attempt, etc., and is concerned she will be persecuted by the state's attorney, one of the possible conspirators. The state's attorney, in its persecution of the defendant, may resort to using the criminal «order for protection» demand the defense's assigned attorneys were pressured to sign in order to punish the defendant for seeking justice. The defendant recalls seeing no other version but the original, which was functionally a gag order, barring her from even showing evidence to another attorney. The defendant has not signed such an order, but the court ruled in favor of some gag order. Given that the misinformant claimed to be acting downstream of statements made by officials working for the state & federal government while making those death threats & threatening her to take illicit plea deals, & given that the misinformant was apparently acting in collusion with James Elliott, there is serious concern & the appearance of impropriety here. There is concern both that Elliott would attempt to charge the defendant in an effort to conceal these crimes, & that this court would refuse to give its consent to the lawsuit to cover up the malfeasance of the FBI & state's attorney by denying her, & thus further violating her rights, because by keeping the defendants here on false charges, the state's attorney is already acting to cover up malfeasance by the FBI. That the state's attorney might be able to threaten the defendant if she seeks justice – that this is even something the defendant is burdened to even consider is outrageous itself. Overall, this is just one more example of how the state has violated the defendant's first amendment right & other rights.

38. That the defendant here declares her intent to write the «governor» of MD over the state's attorney's & FBI's gross misconduct, including the death threats & other violations, some of which are subject to Elliott's illicit gag order, because the defendant has learned that there's a so-called «judge's seat» opening in Allegany co, & that Elliott is rumored to covet this seat, & the «governor» makes such appointments. No one who shows such appalling malicious & reckless disregard for peoples' rights should ever serve as judge. The defendant is concerned that Elliott will use the gag order to defend its political/career ambitions. Likewise, if the defendant reported Elliott to the ABA, there is concern Elliott would retaliate using the gag order.

39. That the state's attorney, James Elliott, and accomplices have acted on interests conflicting with the interests of justice, by abusing their position, & sought a gag order in this case not to protect any legitimate interest but in order to protect themselves from criminal prosecution of their conspiracy to threaten the defendant with death in order to interfere with the defense of another innocent person they have damned themselves by trying to scapegoat. They have acted as do those who are used to impunity, & believe that sufficient abuse can accomplish anything. But the currency of this paradigm, as in the Soviet Union, is the false confession, and the broken humans Elliott has pressed into service & who assert their religious fanaticism like opium addicts looking for a fix of another human breaking like they have, have come up dry. In GULAG Archipelago, there is an anecdote of a woman who when faced with the routine torture for false confessions, & false implication of everyone they could possibly name, that swept up whole apartment

docks as slaves for the GULAG, instead said, «I would be glad to face God this instant. You'll never get anything out of me.» It was said that they freed her. They were wiser than Elliott here, because here the pyramid scheme crashes into reality. The idea that everyone is guilty and that the consensus of who is guilty & what is just will adapt to the pressures necessary to maintain power is nothing but hopium, here the defendants stand having faced death, unbroken, living proof of the inevitability of this regime's doom.

40. That the state's attorney has additionally acted to conceal, through discovery violations, for five months that the 911 caller in the case made a false police report/call, for 10 months that dispatch made material representations to the troopers who responded, for five months that a trooper covered up these two falsehoods by committing perjury on the charging documents, for 5 months that the defendants were being falsely accused of being on the wrong road, and for 5 months that the search warrant was based on perjured statements, among other violations, like concealing that Joe Broadwater lied to the FBI for 11 months.

41. That many of the above points serve to illustrate that the state's attorney has acted to maintain an illegal advantage over the defense, through the violation of due process, and attorney-client privilege, and through deception, presenting a pretense as though to have no more discovery to disclose when there was (and still possibly is) significant exculpatory evidence which wasn't disclosed in a timely fashion. It acted to conceal its advantage by violating court discovery rules.

42. That further, the state's attorney has engaged in a pattern of releasing discovery at the last minute, either to compel a continuance, or to release it right before trial such that the defense doesn't have adequate time to view the discovery. The late release of discovery on the 17th, 19th, & 20th of November are examples of this pattern, as is the release of the 2025-12-31 & 2026-01-05 discovery, both of which were provided to defendants on 2026-01-05, or so.

43. That the delayed release of 20 Terabytes (for those unaware of how much data that is, consider that's about 5000 full-length movies worth of data, depending on how that data is compressed,) right before the upcoming motions hearings is a new & egregious example of this pattern. Note that those approximately 20 Terabytes is all the digital evidence the FBI has claimed to have downloaded from the trucks.

44. That the state's attorney admitted in a hearing that there was no evidence that the defendants had sold any LSD. If there were evidence that the defendants had been selling or distributing LSD, that would presumably show up in the data. But the FBI has given no indication that the 20TB contains that evidence. The absence in this massive trove is glaring.

45. That with regards to the 20TB, the state's attorney & its investigators made the following statements via email on 2025-12-15: «As indicated by my communication with you last week, the information you have requested is being made available but it is a significant amount of material & I believe review [illegible] I would strongly encourage you to make a determination to postpone the proceedings again.» And on that same date in a separate email: «Because the data being copied needs to be validated, it will take until approximately January 12, 2025 to have everything imaged, assuming we start very soon.» That's ridiculous.

46. That the defendant has a Master's degree in Bioinformatics, a field which requires working with large datasets, has in the course of her duties worked with device images, including very large ones of over 8TB, & has copied

and validated data through means which would be considered industry standard, and which are likely the same or similar to the means through which the FBI validates copies. In the course of her work, the defendant has also written reports on the copying & validation of backup devices, like those described. The defendant wishes to note that it would take her at most three days to do the work the FBI is absurdly claiming it would take almost a month to do. Incredibly, this seemingly arbitrary & otherwise inexplicable delay on the new discovery, proposed by the FBI & Elliott, would result in the defense receiving this new data right before trial, with no time to review all of it - likely triggering a continuance.

47. That taken with the previous acts of the state's attorney, these actions constitute a pattern of misconduct, to conceal the defendants' innocence (with regards to the status of the road, the false police call, & the lies of dispatch), to conceal the state's attorney's own unjust advantage over the defendants, and so to extend the false imprisonment of the defendants so that the FBI may continue to conceal that their bad faith investigation against the defendants died long ago, & to continue to conceal exculpatory evidence regarding Youngblut's innocence as part of a cover up perpetrated by certain members of the regime in an effort to protect a border patrol agent, by a mock trial, from justice for the murder of Ms. Bauckholt & the attempted murder of Youngblut.

48. That upon reviewing the discovery, the defendant has discovered that the FBI produced approximately 94 folders in Feb (where each folder contains a report that memorializes some action taken by some FBI human(s)), approx 73 in March, approx 50 in April, approx 25 in May, & near the same number in June. Following that, the majority of the FBIs acts appear to be beaurocratic or reviews of jail calls, texts, & mail. They attempted to revive a dead investigation through a new search warrant in August, with an alleged investigation into alleged improper disposal of batteries. No indictment has followed. The FBI alleges it has produced approximately 8,219 pages of discovery, amounting to approximately 14GB of material. Most of these documents were produced between Feb-June. Additiona the FBI claims to have analysed or attempted to analyse around 20TB from digital devices. In the course of their bad faith investigation the FBI seized almost every possession owned by the defendants & some of their friends or associates, including journals & at over 80 electronic devices. In all of that, the FBI has been unable to find enough evidence to indict the defendants for any crimes in reference to unfounded allegations that the defendants are involved in any murders or murderous plots.

49. That to this date, the defendants in this case have seen no more than about 59% of the total documents produced by the FBI, & have seen less than 0.017% of all discovery, if one counts how the defense has yet to see 20TB of digital discovery. The FBI & state's attorney have omitted at least 177 federal files from the discovery & are arbitrarily delaying the release of 20TB of digital discovery, & are deciding for the defense what is exculpatory & relevant for the defense or not. Up until January, exculpatory impeachment evidence (which was created in Feb.) of a witness was wrongfully withheld from the defense, for just one example among many, raising the question of whether more relevant evidence is being withheld. The FBI & state's attorney do not have the right to decide what is exculpatory & what isn't for the defense, & especially don't have the right to decide by entirely omitting (or unreasonably delaying the release of approx. 99.98% of the discovery. The remaining evidence provided to the defense is heavily redacted, with at least 6 documents containing redactions. Some documents are so heavily redacted, they look almost indistinguishable from Pam Bondi's redactive "release" of the Epstein files.

50. That violating due process in the ~~[illegible]~~ false hope that these violations won't matter, in relation to a bad bet that the regime will sweep all the defendants up in some massive superceding indictment is a loser's bet. Every violation of due process does matter, & the defendants won't cede their rights, & won't falsely confess. It is said that the first thing to do when one realises they're in a hole is to stop digging. With every violation of due process, death threat, abuse, torture, & other rights violations, the state has only dug the hole deeper. For the state to continue on this path of aggressing upon the innocent will only make things worse for itself, because, among other things, it is undeniable that the state's attorney has had access to the discovery too, & the responsibility to seek out exculpatory evidence, & should have noticed the defendants weren't trespassing. The defendants, after all, figured that out within a few minutes using a website run by Maryland state on 2025-02-15, & this information was confirmed by a real estate attorney & tax maps. If the defendants are tried on trespassing, they'll win, & have grounds for a malicious prosecution suit for that alone.

51. That the defendant has been adamant this entire time that the FBI is using the excuse that disclosure would impede an ongoing investigation into the defendants in order to conceal exculpatory evidence formerly in possession of the defendants that could exonerate Youngblut in their Vermont trial. It is the defendant's belief that the defense in Vermont has also been denied this exculpatory evidence which consists of at least four video files and emails. This is also a very similar tactic alleged to be used by the Dept. of (In)justice to conceal the names of certain offenders in the Epstein files. It's also obstruction of Justice.

52. That the FBI's investigation into the defendants was in bad faith from the start, and was an attempt to find things to use in bringing phony charges against the defendants in a mock legal paradigm, where the investigators knew from the start that Youngblut committed no unprovoked attack, so there could be no plots against DHS for them to find. Their investigation was nothing more than a means to attempt to threaten witnesses into silence, & bury the truth. That the FBI through Lasher & Elliott had chosen Bruckner as a covert mouthpiece towards the defendant, & that this confidential misinformant, while acting as a government «agent», then threatened the defendant that she could be assassinated if she did not stop speaking out in Youngblut's defense is further evidence of the regime's criminal intention in this matter.

53. That Bruckner would likely confess to committing the death threats if approached in a fashion like as though to suggest that it might be eligible for a reward for having made such threats, but this defendant would bet the regime will either refuse to interrogate or will be like, «you didn't make death threats did you?» while shaking their heads to tip Bruckner off that Bruckner would be admitting to a crime if Bruckner said so, because it is a bet that the regime condones (implicitly) such threats.

54. That it was unjust and a violation of the defendants' rights to hold the defendants on false charges in the first place. It's a grossly unjust & obscene violation of due process, where a state's attorney breaks court rules repeatedly just to hold defendants here on false charges long after speedy trial rights have been breached.

55. That it is an obscene injustice to falsely imprison people in an effort to conceal from the public that the FBI spent millions of the public's tax dollars to seize innocent peoples' property, & to analyse what may be hundreds of thousands of

words of dense metaphysics that isn't criminal to maintain or produce, but which gives FBI humans a headache & makes them feel bad about themselves. And all of this in an attempt to terrorize those innocent people, through the threat of phony charges & death threats, into ceasing to defend another innocent person from an illicit threat of death.

56. That it is an act of obscene cruelty, despotism, & the mark of a tyrannical regime to use a bad faith investigation & the threat of phony charges to conceal exculpatory evidence, threaten witnesses into silence, & threaten to put an innocent person to death, all to protect a murderous border patrol human. This is Youngblut's LIFE they're threatening! To aid or abet these organized criminals in their effort to put Youngblut to death in a show trial is itself an outrageous crime. Renee Good is probably dead because the regime has so far been able to get away with murdering Ms. Bauckholt & framing Youngblut, and this court has aided in making that possible.

57. That especially with regard to the assassination threat & offer of an illegal deal for dismissal as a means to silence the defendant as a witness, through the FBI, Lasher, & Elliott's chosen delegate, they have violated the possibility of due process by destroying the appearance of due process. It is on the government not to create the appearance of malicious governance, a mock trial run by organized criminals, because one cannot fully engage with court proceedings while under such threats. The appearance of such a conflict of interest would still taint the proceedings even if these threats didn't directly come from the FBI.

WHEREFORE I sincerely request;

A. that this court grant my motion to dismiss.

Points & Authorities:

The discovery in this case
Sixth Amendment of U.S. Constitution
Maryland Rule 4-263(h)
Fifth Amendment of U.S. Constitution
Fourth & Fourteenth Amendment of U.S. Constitution
First Amendment of the U.S. Constitution
Mahmoud v. Taylor, 2025
Cantwell v. Connecticut, 1940
State v. Yoder, 1971
Taylor v. Sterrett, 532 F.2d 462, 73 (5th cir. 1976)
Massiah v. United States, 377 U.S. 201, 206 (1964)
United States v. Henry, 447 U.S. 264 (1980)
Matteo v. Superintendant, SCI Albion (1999)
United States v. Merritt, (2013)

Sincerely Submitted

[signature]

Michelle J. Zajko
Defendant